IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ADA THAXTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:16-cv-02801 |
| ) | Judge Aleta A. Trauger |
| METROPOLITAN GOVERNMENT OF ) | |
| NASHVILLE AND DAVIDSON ) | |
| COUNTY, TENNESSEE, CHIEF STEVE ) | |
| ANDERSON, in his individual capacity, ) | |
| and COMMANDER NATALIE KAYE ) | |
| LOKEY, in her individual capacity, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM**

Before the court is the Motion for Judgment on the Pleadings (Doc. No. 46) filed by defendants Metropolitan Nashville Police Department ("MNPD") Chief Steve Anderson and Lieutenant Kaye Lokey, seeking dismissal of the claims asserted against them in this case in their individual capacity. (Doc. No. 46.) Defendant Metropolitan Government of Nashville and Davidson County ("Metro") has not joined in the motion. For the reasons set forth herein, the motion will be granted in part and denied in part.

I. **PROCEDURAL BACKGROUND**

Plaintiff Ada Thaxter, formerly employed by the MNPD, filed her original Complaint on October 26, 2016, asserting claims against Metro only. (Doc. No. 1.) After Metro filed a Motion to Dismiss, she filed her first Amended Complaint (Doc. No.15), and the court denied as moot Metro's motion seeking dismissal of the original Complaint.

In the Amended Complaint, Thaxter names as defendants, in addition to Metro, MNPD Chief Steve Anderson and Commander Kaye Lokey.[1] She asserts claims against all three defendants, without differentiating among them, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, for discrimination, harassment, hostile work environment, and retaliation (Counts I and II); under 42 U.S.C. § 1983 for First Amendment retaliation (Count III); and for violations of the Tennessee Whistleblower Act, also known as the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304 (Count IV).

The case was stayed in 2017 pending resolution of criminal charges against the plaintiff. (Doc. No. 27.) In April 2019, the parties notified the court that the criminal charges had been retired and that this case could proceed. (Doc. No. 28.) Defendants Anderson and Lokey filed a consolidated Answer to the Amended Complaint and then, with the court's permission, separate Amended Answers to the Amended Complaint. (Doc. Nos. 44, 45.) In November 2019, Anderson and Lokey jointly, through counsel, filed their Motion for Judgment on the Pleadings, arguing that (1) neither defendant can be individually liable under Title VII or the TPPA; and (2) the First Amendment retaliation claim against them fails because (a) if the plaintiff engaged in protected speech at all, she did so as a public employee and not a private citizen; (b) assuming the plaintiff engaged in speech protected by the First Amendment, there are no allegations that link any conduct

---

[1] The case caption identifies only these three defendants. In the text of the Amended Complaint, Thaxter references two other individual defendants, Deputy Chief Brian Johnson and Sergeant Jason Spencer. (Doc. No. 15 ¶ 3.) However, summonses were issued only for Anderson and Lokey (*see* Doc. No. 22), and it does not appear that the plaintiff ever served or attempted to serve the Amended Complaint on any other putative defendants. Her theory of the case set forth in the proposed Initial Case Management Order, incorporated into the actual Initial Case Management Order (Doc. Nos. 35, 36), makes no reference to adding Johnson and Spencer as defendants. Under these circumstances, the court concludes that the reference to these individuals as defendants in paragraph 3 of the Amended Complaint was in error and that the plaintiff does not intend to pursue claims against those individuals.

by the individual defendants to the plaintiff's protected activity; and (c) in any event, the defendants are entitled to qualified immunity.

In her Response, the plaintiff concedes that there is no individual liability under Title VII and the TPPA (Doc. No. 50, at 1), so the court will dismiss those claims as to the individual defendants without further discussion. Regarding her First Amendment retaliation claim, however, the plaintiff, relying in part upon a rambling Affidavit attached as an exhibit to her Response, argues that her speech was protected, that the defendants' actions are directly linked to the adverse actions against her, and that her constitutional rights under the First Amendment are clearly established. (*Id.* at 14–17.)

The defendants filed a Reply, objecting that the plaintiff's Affidavit cannot be considered in the context of a motion for judgment on the pleadings, that the plaintiff's response confirms their entitlement to qualified immunity, and that the plaintiff's attempt to turn an employment matter into a First Amendment retaliation case should be rejected. (Doc. No. 51.)

## II. STANDARD OF REVIEW

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard for evaluating a motion for judgment on the pleadings is the same as that applicable to a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 608 (6th Cir. 2014). "In reviewing a motion for judgment on the pleadings, we construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle [him to] relief." *Id.* (internal quotation marks and citations omitted). "The factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, *i.e.*, more

than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

In ruling on a motion under Rule 12(c), the court may look only at the "pleadings." The term "pleadings" includes both the complaint and the answer, Fed. R. Civ. P. 7(a), and a "copy of a written instrument that is an exhibit to a pleading." Fed. R. Civ. P. 10(c). However, "[i]f, on a motion under Rule . . . 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," in which event "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The Sixth Circuit has made it clear that a district court's "failure to exclude presented outside evidence" is all that is required to automatically "trigger the conversion of a Rule 12(c) motion to a motion for summary judgment." *Max Arnold & Sons, LLC v. W.L. Hailey & co.*, 452 F.3d 494, 503 (6th Cir. 2006).

### III. REJECTION OF MATTERS OUTSIDE THE PLEADINGS

The plaintiff's Affidavit is clearly a "matter outside the pleadings." Fed. R. Civ. P. 12(c); *see also Max Arnold*, 452 F.3d at 502 (characterizing two affidavits submitted by the plaintiff in response to the defendant's Rule 12(c) motion as matters outside the pleadings). Neither party has requested that the court convert the current motion into one for summary judgment, and the court will not do so. Accordingly, the court refuses to accept and expressly excludes from consideration the plaintiff's Affidavit (Doc. No. 50-1). The court will also exclude from consideration that portion of the plaintiff's Response that references and relies upon the plaintiff's Affidavit, if the facts are not also set out in the Amended Complaint.

### IV. FACTS IN THE AMENDED COMPLAINT RELATING TO THE § 1983 CLAIM

The plaintiff was employed as a police officer with the MNPD from 2002 through 2015. She was an officer for the first seven years, was promoted to sergeant in 2009, and made a

lieutenant in 2014. (Doc. No. 15 ¶¶ 7–8.) She allegedly began experiencing harassment related to her race and gender in 2014. The plaintiff alleges that, in the fall of 2014, she began reporting to defendant Lokey, the plaintiff's direct supervisor, that a particular subordinate who reported to the plaintiff was becoming "increasingly confrontational" and insubordinate, but Lokey failed to follow up and ceased responding to the plaintiff's emails. (*Id.* ¶¶ 12–13.) In February 2015, the plaintiff began to experience sexual harassment in the form of harassing texts by a fellow officer. She requested that he stop, but he continued. (*Id.* ¶¶ 14–18.) The plaintiff finally reported the harassment to Lokey in June 2015, but Lokey failed to take any action in response. (*Id.* ¶¶ 24–26.)

In support of her § 1983 claim, the plaintiff alleges that she began to experience retaliation for having reported a fellow officer for sexual harassment. For instance, a new patrol car previously reserved for the plaintiff was instead given to a white male officer, and subordinate officers began bypassing the chain of command to complain about the plaintiff. The plaintiff "pleaded with Lokey" to address the problems the plaintiff brought to her attention, but Lokey ignored her pleas. (*Id.* ¶¶ 27–29.) Instead of helping her, Lokey told others that the plaintiff was "okay" with being sexually harassed. Lokey subsequently sent the plaintiff an unfavorable annual evaluation but refused to discuss it with the plaintiff. (*Id.* ¶¶ 30–31.)

The plaintiff conducted a "private meeting" with the five sergeants under her supervision in August 2015, during which she informed them that they were harassing her, discriminating and retaliating against her, and generally creating a hostile work environment. (*Id.* ¶ 32.) One of the officers, Sergeant Spencer, secretly video-recorded this meeting. The video-recording eventually made it into Lokey's possession; Lokey gave it to the Office of Professional Accountability ("OPA"), but Lokey did not report the plaintiff's concerns about being sexually harassed to the OPA. (*Id.* ¶¶ 32–34.)

In September 2015, the plaintiff filed an official OPA complaint with Deputy Chief Brian Johnson against Lokey for "failing to supervise and failing to report Plaintiff's sexual harassment allegation on July 22, 2015; hostile work environment; discrimination; and retaliation." (*Id.* ¶ 40.) Within about ten days, the OPA interviewed the plaintiff concerning her complaint. Approximately two weeks after that, toward the end of September 2015, the plaintiff was interviewed about the August 2015 videotaping incident. (*Id.* ¶¶ 41–42.) The plaintiff described her strained relationship with Lokey, and the "Chief" asked if she would like a transfer.[2] The plaintiff replied that she did not believe she should be forced to transfer, since she had done nothing wrong. On October 1, 2015, the plaintiff was interviewed by Sergeant Carlos Lara regarding her complaints against Lokey. (*Id.* ¶¶ 41–43, 45.) HR later contacted the plaintiff to ask if she wanted to transfer. She again declined on the basis that she herself had not done anything wrong. (*Id.* ¶ 47.) On November 19, 2015, Chief Anderson informed the plaintiff that she would be transferred to Youth Services effective December 1, 2015. The plaintiff objected that such a move would make matters worse. (*Id.* ¶ 50.)

The plaintiff was interviewed about her various complaints by HR Director Sue Bibb on December 3 and again on December 4, 2015. The first interview concerned the hostile work environment claims, and the second involved the sexual harassment claims. While waiting outside the HR office on December 4, the plaintiff overheard Bibb telling someone that the plaintiff's claims were meritless. The plaintiff filed a complaint against Bibb that day. (*Id.* ¶¶ 55–59.)

On January 19, 2016, Lokey filed a complaint against the plaintiff for "untruthfulness" with the OPA. (*Id.* ¶ 61.) The plaintiff was decommissioned and assigned to a desk job during this

---

[2] It is unclear here whether the plaintiff is referring to Chief Anderson or to Deputy Chief Johnson, to whom she had made the OPA complaint.

investigation, even though the individuals against whom the plaintiff had submitted complaints were not similarly decommissioned. (*Id.* ¶¶ 61–62.)

The plaintiff took FMLA leave beginning on January 25, 2016, less than two months after her transfer to Youth Services, due to the stress related to these events. After her FMLA leave expired, she used sick days, holidays, and comp time to remain on leave. She resigned from the MNPD on May 17, 2016. (*Id.* ¶¶ 63–66.) She claims that she had "no choice but to resign . . . out of fear of continuous harassment, discrimination, and retaliation." (*Id.* ¶ 66.)

## V.     DISCUSSION

To state a prima face claim for retaliation in violation of her rights under the First Amendment, the plaintiff must show that:

> (1) [s]he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [her] protected conduct.

*Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014). The defendants contend that the plaintiff cannot show that she engaged in protected conduct or that, if any adverse action was taken against her, there is a causal connection between her protected speech and the adverse action. They also claim that they are entitled to qualified immunity as to this claim.

### A.     Whether the Plaintiff Engaged in Protected Speech

In this case, the plaintiff alleges that she engaged in a very broad range of speech in a wide variety of contexts and on a variety of topics. She claims that she (1) complained about sexual harassment by a colleague to her direct supervisor, defendant Lokey, and to Captain Christopher Gilder (Doc. No. 15 ¶¶ 24, 44); (2) complained to Lokey and others about insubordinate and otherwise inappropriate behavior by an individual who reported to the plaintiff (*id.* ¶¶ 12, 37); (3) complained to her subordinates about their sexually harassing conduct toward her (*id.* ¶ 32); and

(4) complained about Lokey to her "superior(s)," specifically regarding various violations of department policy (*id.* ¶ 36); and (5) complained about Lokey and HR Director Sue Bibb to the OPA and to HR and then participated in investigations conducted by those offices (*id.* ¶¶ 40–43, 45, 59). It is not entirely clear from her pleading which of this "speech" the plaintiff believes to be protected, but she alleges generally under Count III of the Amended Complaint that she engaged in "protected speech or conduct by speaking about matters of pubic concern regarding unethical and dangerous behavior in the workplace, including voicing concerns about sexual harassment by government employees, the willful ignorance of said conduct by supervisors in the government, and modification of internal complaints and investigations by government employees and police department officials." (*Id.* Count III ¶ 51, at 11.[3])

Although "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," *Connick v. Myers*, 461 U.S. 139, 142 (1983), it is also true that "a public employee's First Amendment rights are narrower than [those of] the citizenry at large." *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 56 (1968)). Specifically, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern," *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), but it does not turn every "employment decision [into] a constitutional matter." *Connick*, 461 U.S. at 143.

In order to avoid such an outcome, "[w]hen the plaintiff is a public employee, she must make additional showings to demonstrate that her conduct was protected." *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000). The Sixth Circuit engages in a "three-step inquiry to determine whether speech by a public employee is protected." *Buddenberg v. Weisdack*, 939 F.3d 732, 739

---

[3] The paragraphs of the Amended Complaint are misnumbered beginning on page 9.

(6th Cir. 2019 (citing *Mayhew*, 856 F.3d at 462). "First, we ascertain whether the speech addressed a matter of public concern. Second, we determine whether the employee spoke as a private citizen or as an employee pursuant to her official duties. Third, we balance the interests of the parties and determine if the employee's speech interest outweighs 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); other internal citations omitted)). Whether the plaintiff engaged in protected speech is a question of law. *Id.* at 464. It is also, however, an "intensely context-driven" inquiry: "Although the elements of a First Amendment retaliation claim remain constant, the underlying concepts that they signify will vary with the setting—whether activity is 'protected' or an action is 'adverse' will depend on context." "*Thaddeus–X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999) (en banc).

Regarding the first inquiry, whether the speech at issue concerns or "touches on" a matter of public concern," *Handy-Clay v. City of Memphis*, 695 F.3d 531, 543 (6th Cir. 2012), the defendants make no attempt to argue that the plaintiff's speech was not on a matter of public concern. And, indeed, in the Sixth Circuit, "it is well-settled that allegations of sexual harassment, like allegations of racial harassment, are matters of public concern." *Bonnell v. Lorenzo*, 241 F.3d 800, 812 (6th Cir. 2001); *see also Jennings v. Wayne Cty.*, No. 13-10392, 2015 WL 5589869, at *12 (E.D. Mich. Sept. 22, 2015) (recognizing that sexual harassment "has been recognized as inherently a public concern"); *Schroeder v. City of Vassar*, 371 F. Supp. 2d 882, 893 (E.D. Mich. 2005) (finding that employee's complaint that a coworker had violated the city's sexual harassment policy "touch[ed] upon a matter of public concern").[4]

---

[4] Other courts parse this question a little more finely. In the Third Circuit, for example, while recognizing that claims of sexual and racial harassment or discrimination *can* constitute matters of public concern, even when made in private, the courts also look to such matters as

Nor do the defendants argue that the plaintiff's speech interest is outweighed by the public agency's interest in promoting the efficiency of its public services, the third step of the inquiry.

Instead, the defendants argue that the plaintiff fails at the second step of the analysis, because she did not speak as a "private citizen" but as a public employee. In *Garcetti*, the Supreme Court held that, when a government employee speaks "pursuant to [her] official duties," she is "not speaking as [a] citizen[] for First Amendment purposes." 547 U.S. at 421. As construed in later decisions from the Supreme Court and the Sixth Circuit, the exception carved out by *Garcetti* "'must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment.'" *Mayhew*, 856 F.3d at 464 (quoting *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015)). Thus, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014).

The Sixth Circuit has recognized that determining whether an employee speaks "pursuant to" her official duties "can be challenging," because the Supreme Court has not "articulate[d] a

---

whether the allegation involves misconduct by an elected official or a "wider pattern of inappropriate misconduct" involving others beyond simply the plaintiff. *Middleton v. Deblasis*, 844 F. Supp. 2d 556, 564 (E.D. Pa. 2011); *see also Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997) ("[I]f the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context."); *Bell v. City of Phila.*, 275 F. App'x 157, 159 (3d Cir. 2008) (affirming dismissal of First Amendment retaliation claims for not involving a "matter of public concern," where the plaintiff did not seek "to expose discriminatory or harassing practices or policies at the DA's Office, but complained solely about [the plaintiff's] own 'abuse' and mistreatment by superiors and co-workers").

The Sixth Circuit has not made any such distinction, instead holding more generally that complaints about sexual harassment, *per se*, involve a matter of public concern. *See, e.g.*, *Bonnell*, 241 F.3d at 812. It has indicated that the question of the context of the statement is relevant to the determination of whether the speaker bringing the concerns does so as a private citizen or pursuant to her job duties, but it has never suggested that the broader context of the subject speech should be factored into the determination of whether the speech itself involves a matter of public concern.

comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Mayhew*, 856 F.3d at 462 (quoting *Garcetti*, 547 U.S. at 424). Making this determination requires the court to consider the "content and context" of the public employee's speech, *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 350 (6th Cir. 2010), including such factors as "the speech's impetus; its setting; its audience; and its general subject matter"—that is, the "who, where, what, when, why, and how" of the speech—to answer the "critical question" of "whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Mayhew*, 856 F.3d at 464 (citations omitted). "Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008); *see also Garcetti*, 547 U.S. at 424–25 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's professional duties for First Amendment purposes.").

In other words, although the question is one of law, answering it is an inherently fact-driven inquiry, one more readily resolved in the context of a motion for summary judgment. *See, e.g.*, *Mayhew*, 856 F.3d at 464 (deciding based on the facts before it that "Mayhew's reporting of Noble's misconduct to Roberts and then to those in City Hall falls within his 'ordinary job responsibilities'"). The Sixth Circuit has affirmed the granting of a motion to dismiss on this ground, but only when it is clear from the allegations in the complaint that the speech occurred as part of the plaintiff's job duties. *See, e.g.*, *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 543–44 (6th Cir. 2007) ("Weisbarth finally asserts that we should be hesitant to dispose of her First Amendment retaliation case based solely on the pleadings. But . . . Weisbarth's complaint . . .

makes clear that she spoke pursuant to her official duties rather than 'as a citizen,' and her claim was therefore properly dismissed.").

In this case, the defendants argue that the plaintiff's complaints were obviously made pursuant to her job duties, because complaints or concerns made "in house" and "up the chain of command" are inherently part of any employee's job responsibilities. (Doc. No. 47, at 10.) The cases cited for that proposition, however, typically involve complaints that are actually *about* the employee's job duties. *See, e.g.*, *Keeling v. Coffee Cty.*, 541 F. App'x 522, 527 (6th Cir. 2013) (affirming summary judgment for the defendant county based on the finding that the employee's speech "pertained to her employment—her and her supervisor's ability to properly assist members of the public who came to the Codes Department—and was made up the chain of command"); *Handy-Clay*, 695 F.3d at 541–42 (where the plaintiff admitted that "her primary responsibilities included ensuring that record requests from the public were 'routed to the appropriate records custodian and responded to in a timely manner,'" holding that "complaints about obstacles interfering with her ability to produce records" were "directly related to her alleged job responsibilities" and, therefore, were not protected speech); *Fox*, 605 F.3d at 350 ("[C]ases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace *about his job duties*, that speech is undertaken in the course of performing his job." (emphasis added) (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008))); *Haynes v. City of Circleville*, 474 F.3d 357, 365 (6th Cir. 2007) (noting that the plaintiff, in the course of his job duties, "had developed the standard operating procedure for the canine unit and worked with his dog as part of his day-to-day professional activities" and, therefore, that his memo to the police chief pursuant to those duties was not protected speech). However, a complaint about sexual harassment is not equivalent to, for instance, drafting and

sending a memo complaining about changes to a program overseen by a plaintiff. *See Haynes*, 474 F.3d at 364; *see also Garcetti*, 547 U.S. at 422 ("When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee."). Further, the Sixth Circuit has expressly recognized that "[t]he reasoning of *Garcetti* and *Haynes* . . . makes clear that the determinative factor in those cases was not where the person to whom the employee communicated fit within the employer's chain of command, but rather whether the employee communicated pursuant to his or her official duties." *Weisbarth*, 499 F.3d at 545.

In this case, the plaintiff has not itemized her job responsibilities in the Amended Complaint (nor was she required to). It is nonetheless clear from her allegations that much of the speech in which she was engaged fell within the scope of her job. Complaints to her own supervisor about insubordinate behavior by an individual who reported to the plaintiff seem to fall in that category. Verbal complaints to the sergeants who reported to the plaintiff, communicated during an on-the-job meeting with those sergeants, clearly took place during and "pursuant to" the plaintiff's job duties. Likewise, complaints about Lokey or others made in the context of interviews with the OPA and HR, made pursuant to investigations conducted by those offices while the plaintiff was on the job, fell within the plaintiff's responsibilities, even if those responsibilities arose *ad hoc* in response to the department's need to investigate her complaints. *Accord Weisbarth*, 499 F.3d at 543, 544 (holding that the plaintiff's answers to job-related questions posed by a consultant hired for the purpose of conducting a departmental evaluation were made pursuant to an "'ad-hoc' duty that arose in the course of [the plaintiff's] employment").[5]

---

[5] Again, for purposes of their motion, the defendants do not dispute that the plaintiff's speech touched on matters of public concern.

This leaves only the plaintiff's complaints to Lokey about sexual harassment by a colleague (Doc. No. 15 ¶¶ 24, 44) and complaints about Lokey to unspecified superiors about conduct by Lokey that violated department policy or was illegal (*id.* ¶ 36). The defendants have not presented any persuasive argument that this type of speech fell squarely within the plaintiff's job responsibilities or were made pursuant to her job duties, and the allegations in the Amended Complaint suggest that they did not. (*See id.* at Count III ¶ 52, at 11 (stating that the purpose of the plaintiff's speech was to "illuminat[e] unethical and dangerous conduct [by] public figures and/or police department officials" and to "ensure public safety by ensuring that the precinct followed policy and disciplinary guidelines").)

In sum, the matter of whether the plaintiff's speech—specifically, her complaints to Lokey about sexual harassment and her complaints about Lokey to others—was made "pursuant to" her ordinary job duties cannot be resolved at this juncture. The defendants are not entitled to dismissal on the grounds that the plaintiff fails to show that she engaged in protected speech, the first element of the plaintiff's First Amendment retaliation claim.

B.  **The Causal Connection**

To determine whether a causal connection existed between protected conduct and an adverse action, the court must consider "whether the alleged adverse action 'was taken at least in part because of the exercise of the protected conduct.'" *Buddenberg*, 939 F.3d at 741 (quoting *Holzemer v. City of Memphis*, 621 F.3d 512, 525 (6th Cir. 2010)).[6]

---

[6] This standard is not the same as the "but-for" causation required to prove a Title VII retaliation claim, established by the Supreme Court in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013). *See Mooney v. Lafayette Cty. Sch. Dist.*, 538 F. App'x 447, 453 n.4 (5th Cir. 2013) ("The holding in *Nassar*, however, does not apply to the First Amendment causation standard, which requires only that protected speech be a 'substantial' or 'motivating' factor in the adverse employment action suffered by the plaintiff.")

The defendants do not argue that the plaintiff did not suffer an adverse action that was sufficiently hostile to "deter a person of ordinary firmness" from engaging in the protected speech, *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (citation omitted), the second element of her First Amendment retaliation claim. Instead, they argue that, even assuming the plaintiff's speech was protected for purposes of her First Amendment retaliation claim and that she suffered adverse actions, the plaintiff has not alleged facts sufficient to show a causal connection between her speech and the allegedly retaliatory conduct. Specifically, they argue that the Amended Complaint provides only "conclusory allegations that the 'defendants' collectively knew about her speech" and that her speech was a motivating factor in the "defendants'" adverse actions against her. (Doc. No. 47, at 12.)

The plaintiff broadly alleges that, immediately after she complained about sexual harassment to Lokey, she began experiencing hostile behavior from Lokey, including that Lokey failed to assist the plaintiff in "remedy[ing] the situation" when the plaintiff was deprived of the new patrol car that had previously been reserved for her; ignored problems the plaintiff brought to her attention; told co-workers that the plaintiff was "'okay' with being sexually harassed"; refused to discuss the plaintiff's annual evaluation with her; gave the secretly made videotape to OPA; failed to report the plaintiff's concerns about sexual harassment to OPA; and removed documents from the plaintiff's inbox. (*Id.* ¶¶ 27, 29–31, 34, 52.) Contrary to the defendants' assertions, the plaintiff clearly alleges that Lokey was aware that the plaintiff had complained about sexual harassment, because the plaintiff complained to Lokey. And the allegations of hostile conduct are not vague or generalized but are directed specifically toward Lokey. Finally, while the plaintiff does not specifically allege a causal connection, the apparent close temporal proximity between her complaints and Lokey's actions (ranging from a few days to a few months) is sufficient, at this

juncture at least, to create an inference of a causal connection between them. *See Buddenberg*, 939 F.3d at 741 ("The chronology of events alleged in [the plaintiff's] complaint supports an inference of causation. Temporal proximity between the protected activity and the adverse action can support a causal connection." (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)); *see also Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) ("A lapse of two months . . . is sufficient to show a causal connection").

Regarding Chief Anderson, the defendants' arguments gain no more traction. The plaintiff alleges that, on Thursday, November 19, 2015, Anderson mandated the plaintiff's transfer to Youth Services effective December 1, 2015. (Doc. No. 15 ¶ 50.) The plaintiff objected to this move, telling Anderson that the move would make her work situation worse. (*Id.*) The defendants argue that the plaintiff does not actually allege that Anderson knew about her protected speech or that it factored into Anderson's decision to transfer her. (Doc. No. 47, at 13.) A fair reading of the Amended Complaint, however, particularly given the plaintiff's reference to her difficult "work situation" during her meeting with Anderson, permits the inference that Anderson was aware of the plaintiff's allegations of sexual harassment against a colleague and the plaintiff's strained working relationship with Lokey. It also permits the inference that the mandated transfer, coming on the heels of Sue Bibb's and another officer's suggestions that she accept a transfer, was related to these incidents and, thus, that the transfer was motivated "at least in part" by the plaintiff's having reported sexual harassment. *Buddenberg*, 939 F.3d at 658.

Dismissal on this ground is also not warranted.

### C. Qualified Immunity

Finally, the defendants assert that they are entitled to qualified immunity to the plaintiff's claim under § 1983. To withstand a motion to dismiss on qualified immunity grounds, the plaintiff must allege facts that "plausibly mak[e] out a claim that the defendant's conduct violated a

constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Buddenberg*, 939 F.3d at 738 (quoting *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015)). That is, the court must consider "whether the facts alleged make out a violation of a constitutional right" and "whether the right at issue was clearly established when the event occurred so that a reasonable officer would have known that his conduct violated it." *Id.* The court can consider the factors in any order, and, if either is not met, the officer is entitled to qualified immunity. *Doe v. Miami Univ.*, 882 F.3d 579, 604 (6th Cir. 2018) (internal citations omitted).

In order to satisfy the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). To determine whether a right is clearly established, "a district court must look to then-existing binding precedent from the Supreme Court, the Sixth Circuit or itself." *Klemencic v. Ohio State Univ.*, 111 F.3d 131 (6th Cir. 1997). The determination of whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Floyd v. City of Detroit*, 518 F.3d 398, 405 (6th Cir. 2008) (quoting *Saucier v. Katz*, 553 U.S. 194, 201 (2001)). However, "officials can still be on notice that their conduct violates clearly established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). When the defendants raise qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009).

The Sixth Circuit has repeatedly cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity" and that, [a]lthough an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest

possible point, that point is usually summary judgment and not dismissal under Rule 12." *Buddenberg*, 939 F.3d at 738–39 (quoting *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015)). At the motion to dismiss stage, the relevant inquiry is whether the plaintiff has alleged "facts which, if true, describe a violation of a clearly established statutory or constitutional right of which a reasonable public official, under an objective standard, would have known." *Doe v. Ohio State Univ.*, 219 F.Supp.3d 645, 664 (S.D. Ohio 2016).

The defendants argue that, even assuming the plaintiff has established the violation of a constitutional right, the right was not clearly established at the relevant time. In support of this argument, the defendants assert that there are "no Sixth Circuit cases that clearly establish that Plaintiff spoke as a private citizen." (Doc. No. 47, at 11.) Instead, they argue, there is a long line of Sixth Circuit cases establishing that "speech is not protected when it concerns an employee speaking about their own work environment within their organization." (*Id.* at 11–12.) The defendants characterize the plaintiff's complaints generally as a "quintessential employee beef that management had acted incompetently." (*Id.* at 12.)

A complaint about sexual harassment is not simply a complaint that management has acted incompetently. The Sixth Circuit, moreover, has "long recognized that a public employer may not retaliate against an employee for her exercise of constitutionally protected speech." *Buddenberg*, 939 F.3d at 741 (citing *See v. City of Elyria*, 502 F.3d 484, 495 (6th Cir. 2007)); *Chappel v. Montgomery Cty. Fire Protection Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997) ("All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern . . . .").

Regarding the defendants' assertion that it was not well established that an employee in the plaintiff's situation acted as a private citizen, *Garcetti* established in 2006 that, "when public

employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. In 2014, the Court clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. In other words, the legal framework governing resolution of this case is, and has been for some time, well established. The court's conclusion that the plaintiff has adequately alleged a violation of her constitutional rights rests in part on a determination that the plaintiff has adequately alleged, at least by inference, that reports of sexual harassment did not fall within her ordinary job duties. Because there is basically an unresolved factual question as to whether the plaintiff spoke as a private citizen or within the scope of her job duties when she reported sexual harassment by a co-worker and, therefore, as to whether the defendants knew or should have known that such speech was outside the scope of her ordinary job responsibilities, the question of whether the right at issue here was clearly established cannot be resolved on a motion for judgment on the pleadings.

At this juncture, then, the defendants are not entitled to qualified immunity.

## VI. CONCLUSION

For the reasons set forth herein, the court will grant in part and deny in part the Motion for Judgment on the Pleadings. While the plaintiff's individual capacity claims under Title VII and the TPPA will be dismissed with prejudice, her First Amendment retaliation claim will be permitted, for now, to proceed, but only insofar as it concerns her complaints to Lokey about sexual harassment by a colleague and complaints about Lokey to others that Lokey had engaged in conduct that was illegal or violated department policy.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge