# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| ADA THAXTER,            ) | |
|                       ) | |
|     **Plaintiff,**       ) | |
|                       ) | |
| **v.**                       ) | **Case No. 3:16-cv-02801** |
|                       ) | **Judge Aleta A. Trauger** |
| **METROPOLITAN GOVERNMENT OF**   ) | |
| **NASHVILLE AND DAVIDSON**       ) | |
| **COUNTY, TENNESSEE, CHIEF STEVE** ) | |
| **ANDERSON, in his individual capacity,** ) | |
| **and COMMANDER NATALIE KAYE**    ) | |
| **LOKEY, in her individual capacity,**    ) | |
|                       ) | |
|     **Defendants.**      ) | |

## MEMORANDUM

Before the court is Defendants' Motion for Summary Judgment (Doc. No. 55), filed by defendants the Metropolitan Government of Nashville and Davidson County ("Metro"), Metro Nashville Police Department ("MNPD") Chief Steve Anderson, and MNPD Commander Natalie Kaye Lokey, seeking judgment in their favor on all remaining claims in this matter. For the reasons set forth herein, the motion will be granted in part and denied in part.

## I. PROCEDURAL HISTORY

On October 26, 2016, plaintiff Ada Thaxter, previously employed as a lieutenant with the MNPD, filed a Complaint in this court naming only Metro as a defendant, asserting claims (1) under 42 U.S.C. § 1983 for retaliation resulting from her exercise of her rights under the First Amendment; (2) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, for sexual harassment; and (3) under the Tennessee Whistleblower Act, Tenn. Code Ann. § 50-1-304, also known as the Tennessee Public Protection Act ("TPPA"). (Doc. No. 1.) In response to a Motion

to Dismiss, the plaintiff filed an Amended Complaint on February 7, 2017, in which she continued to name Metro but also added as defendants Chief Anderson and Commander Lokey. (Doc. No. 15.) Without identifying which claims are asserted against which defendants, the Amended Complaint, like the original, asserts claims of First Amendment retaliation, sexual harassment, and violation of the TPPA, and it adds a Title VII claim based on a racially hostile work environment. (*Id.*) Shortly after the filing of the Amended Complaint, the case was stayed for almost two years pending the resolution of criminal charges against the plaintiff. (*See* Doc. No. 27.)

After the case was reopened in April 2019, defendants Anderson and Lokey filed a Motion for Judgment on the Pleadings. The court granted in part and denied in part that motion on March 20, 2020. (Doc. No. 54.) Specifically, the court dismissed all individual-capacity claims against Anderson and Lokey under Title VII and the TPPA. The court denied in part the motion to dismiss the First Amendment retaliation claim against Anderson and Lokey, finding that the plaintiff stated a colorable retaliation claim "in connection with the plaintiff's complaints to Lokey about sexual harassment by a colleague and complaints about Lokey to others that Lokey had engaged in conduct that was illegal or violated department policy," but the denial of the defendants' motion to dismiss that claim was "without prejudice to [their] ability to reassert their entitlement to qualified immunity at a later stage of the litigation." (Doc. No. 54, at 1–2.) The court dismissed the plaintiff's First Amendment retaliation claim against Anderson and Lokey to the extent it was

> premised upon the plaintiff's complaints to her supervisor about insubordinate behavior by an individual who reported to the plaintiff; her verbal complaints to the sergeants who reported to the plaintiff, communicated during a meeting with those sergeants; and complaints about Lokey or others made in the context of interviews with the Office of Professional Accountability and Human Resources, made pursuant to investigations conducted by those offices while the plaintiff was on the job.

(*Id.* at 2.)

Now, all three defendants jointly move for summary judgment as to all remaining claims asserted against them. (Doc. No. 55.) Their Motion for Summary Judgment is supported by a Statement of Undisputed Material Facts (Doc. No. 57), Memorandum of Law (Doc. No. 56), and various evidentiary materials, including deposition excerpts, declarations, and other documentary evidence. The plaintiff filed a Response in Opposition (Doc. No. 70), Response to Defendants' Statement of Undisputed Material Facts (Doc. No. 68), and her own Declaration and other documentary evidence. The defendants filed a Reply (Doc. No. 72) with additional exhibits.

## II. STATEMENT OF FACTS

The facts set forth below are undisputed for purposes of the Motion for Summary Judgment, unless otherwise indicated.

Ada Thaxter served in the military on active duty from 1985 through 1992 and was an active member of the Tennessee National Guard from 1992 until 2016, when she transferred to the National Guard Reserves. She began her employment with the MNPD in 2002. She was promoted to sergeant at some point and then to lieutenant. She was temporarily assigned as a trainer at the police academy for a few months during the spring and summer of 2014 before being transferred to MNPD's Midtown Precinct, at that time a brand new precinct, in September 2014, to work under Commander Kaye Lokey.

The plaintiff had a difficult working relationship with Commander Lokey throughout most of the time she was employed at the Midtown Precinct. (Pl.'s Resp. to Defs.' Statement of Undisp. Material Facts, Doc. No. 68 ¶ 8.) Generally, according to the "Summary of Complaints" the plaintiff submitted to Deputy Chief Brian Johnson in September 2015,[1] Lokey failed to support or

---

[1] The document is undated but the plaintiff has stated that she submitted it in September 2015. (Thaxter Decl., Doc. No. 70-1 ¶ 42)

reinforce the plaintiff's authority or to assist her in what the plaintiff perceived to be a rash of insubordinate behavior by the sergeants under her command, most of whom were white men. She claimed that Lokey repeatedly ignored her requests for guidance and assistance, deferred making decisions, and generally was an incompetent commander who failed to function as a supervisor. (*See* Doc. No. 55-2, at 7 ("These are just some of the task[s] and tough issues that I had to face alone without any supervision.").) More specifically, the Summary of Complaints alleged that the plaintiff had been advised even before going to work for her that Lokey was "incompetent, wouldn't make a decision, untruthful" and that the plaintiff needed to "record every conversation with her." (*Id.* at 1.) Lokey allegedly only wanted females to work with her, announced that she was a lesbian, never provided the plaintiff with her expectations of her, "never sat down with [the plaintiff] one time" to go over the plaintiff's evaluations and "never" responded to the plaintiff's requests for a meeting to go over the evaluations. (*Id.*) Lokey "never would follow up with anything, so [Thaxter] started supervising [herself]." (*Id.*) As discussed below, the plaintiff also alleged that Lokey failed to respond to the plaintiff's report that she had been sexually harassed.

Regarding race, however, the plaintiff complained in the September 2015 Summary of Complaints only that Lokey "kept asking about" the two Black sergeants under the plaintiff's command, "but she never once asked about the other 4 white sergeants." (*Id.* at 2.) After several months, the plaintiff asked Lokey if she had an issue with those two particular sergeants, and Lokey "never asked again." (*Id.*) The plaintiff also summarized an issue she had had with another lieutenant on a different shift (Lt. Steve Lewis) and instances of insubordination by the officers working under her supervision, regarding which she contended Lokey failed to intervene or to provide support or assistance. Thaxter's complaints focused particularly on Sgt. Jason Spencer, who, she claimed, did not "want to be supervised by anyone." (*Id.* at 3.) None of her complaints

suggested race discrimination, implicitly or explicitly. Moreover, when the plaintiff's complaint against Lokey was eventually referred to Metro HR for investigation,[2] a committee of "Fact Finders" that interviewed the plaintiff twice interpreted her claim of "hostile work environment" as based "almost entirely on her contention that Cmdr. Lokey was not diligent in her supervisory role. Lt. Thaxter believes Cmdr. Lokey consistently refused or failed to 'back up' Lt. Thaxter's efforts to properly and correctly supervise and discipline the white and/or male officers whom Lt. Thaxter supervised." (Doc. No. 55-3, at 3.) Although the Fact Finders' February 17, 2016 Investigation Summary reflects the race of each of the plaintiff's sergeants, it does not reflect allegations that any of the sergeants' conduct was overtly race-based or, more to the point, that the plaintiff ever reported to Lokey that she believed that either the sergeants' or Lokey's own behavior constituted discrimination or harassment on the basis of race.

When asked during her deposition what made her think her sergeants' insubordinate behavior was based on her race, Thaxter was unable to provide any concrete rationale for attributing their conduct to her race. For example, in response to the request that she relate "every fact" in her possession pertaining to her belief that Jason Spencer's initial act of insubordination (disregarding her assignment of a patrol car and taking a different one just before the Midtown Precinct opened) constituted race-based harassment, she responded: "That started building it to

---

[2] The Investigative Summary dated February 17, 2016 (Doc. No. 55-3) was prepared by Metro Human Resources, is not sworn, is clearly hearsay, and contains hearsay within hearsay. However, neither party appears to contest the summary of events, both parties reference it, and it is one of the few documents in the record that provides the court with a relatively clear chronological summary of the events giving rise to the plaintiff's claims. The document is largely a summary of the plaintiff's statements to Metro HR during two different interviews. Under Rule 56, parties asserting that facts are or are not genuinely disputed may rely, not only on sworn materials such as depositions, affidavits, and declarations, but also on "other materials." Fed. R. Civ. P. 56(c)(1)(A). A party may object to cited material on the basis that it "cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), but neither party has done so in this case.

me. So you can take it and analyze it. I'm just building up the case of the multiple. That was the first encounter before we even opened the precinct." (Thaxter Dep. 84, Doc. No. 55-1, at 21.[3]) Asked again if she had "any facts to support, other than [her] own personal feeling, that he wouldn't have done this to a white person or a male," she answered, "He went in my personal office, not his office, and took something that belonged to me. Yes, that's . . . that's all I can tell you." (*Id.*) Asked what that had to do with race, she stated: "Because I was black. And you're not going to understand it because you're not black." (*Id.* at 85, Doc. No. 55-1, at 22.) Otherwise, she stated that, although she did not witness it, another of her sergeants complained that Spencer was interrupting her roll-calls with "political pro-Trump kind of stuff." (*Id.* at 104, Doc. No. 55-1, at 28.) She had no issues with the other sergeants unless Spencer was there. (*Id.*) She also acknowledged, however, that other officers at MNPD did not want to supervise Spencer because "he was lazy," "called in sick all the time, never was where he was supposed to be. He just wasn't a good sergeant." (*Id.* at 85, Doc. No. 55-1, at 22.)

Asked about her interactions with Commander Lokey, the plaintiff likewise could not identify any specific facts, beyond supposition and conjecture, that Lokey's treatment of her was racially discriminatory. She discussed Lokey's wanting her to dismiss a complaint against an officer under her supervision who had been rude and insubordinate. She refused to back down and her discipline was upheld, but she was left with the feeling that Lokey would not have intervened if the plaintiff had been white: "And that was, I felt – again, here I'm going with my feelings. Would a white male go up to another white lieutenant? I seen it. No, they're not." (*Id.* at 90, Doc. No. 55-1, at 23.) She never heard Lokey use racial slurs or make offensive racial comments. (*Id.*

---

[3] The parties have submitted excerpts from the plaintiff's deposition, rather than a complete transcript. To facilitate locating them in the record, the court refers to them both by the original deposition pagination and by the court' CM/ECF pagination.

at 100, Doc. No. 55-1, at 25.) In the context of responding to a question about why she believed Lokey retaliated against her, the plaintiff explained that Lokey

> wanted [her] to roll the way she . . . rolled . . . . Like, let's not pay attention to that. Let's ignore that. Can we just get away with doing that? And that's what she did. . . . I wasn't a team player for her. And I think she regretted asking me to come out there. I couldn't change, I couldn't deviate. I know what's right and I know what's wrong.

(*Id.* at 150, Doc. No. 55-1, at 46). In short, Thaxter believed Lokey was incompetent, and she informed the police chief and others that Lokey was an incompetent supervisor. (*Id.* at 151, Doc. No. 55-1, at 47.)

The plaintiff first informed Lokey during a meeting in June 2015 that she had been sexually harassed. (Doc. No. 68 ¶ 9.) The plaintiff did not tell Lokey who was harassing her, nor did Lokey ask. (Thaxter Dep. 46, Doc. No. 55-1, at 11.) Instead, Lokey only asked her what she was "doing about it," to which the plaintiff responded that she was "trying to handle it." (*Id.*) She did not tell Lokey what form the harassment was taking. (*Id.* at 53, Doc. No. 55-1, at 15.) There is also no evidence that she told Lokey when the sexual harassment occurred.

According to Lokey, Thaxter first mentioned the alleged harassment to her during a June 2015 meeting to go over the plaintiff's performance evaluation. At the time, Thaxter expressed her dissatisfaction with Lokey's performance and her feeling that Lokey was not supportive and never "had her back." (Lokey Decl., Doc. No. 60 ¶¶ 4–5.) After "a great deal of discussion about that topic . . . , Lt. Thaxter then added that [Lokey] did not know what she had been going through, as she had been sexually harassed." (*Id.* ¶ 6.) Thaxter did not identify the perpetrator, and Lokey was "under the impression that any harassment that had occurred happened outside the workplace and that it was no longer occurring." *Id.* ¶ 7.) Lokey apparently did not ask for details, but she recalled that Thaxter did not indicate that she wished to file a complaint against her harasser. (*Id.* ¶ 8.)

Lokey claimed that, "[a]s a fellow female law enforcement officer" in a field made up predominantly of men, she "was sensitive to Lt. Thaxter's situation and wanted to follow her lead and her wishes in regard to how to handle her alleged harassment." (*Id.* ¶ 9.) Consequently, Lokey "did not proactively initiate an investigation and instead decided to wait for her to come back to me to file a formal complaint or request an investigation if that was the route she decided she wanted to take." (*Id.*)

Although the plaintiff did not then share his name with Lokey, the alleged harasser's name was Sergeant David Howard, an officer on a different shift from the plaintiff and not under her supervision. The plaintiff's story about what form his harassment took has changed over time. In the Summary of Complaints she submitted to Deputy Chief Johnson in September 2015, Thaxter stated:

> One sergeant called and sounded drunk on two separate nights cursing, talking about sex, and going off on me. Stating he wanted me but I wouldn't respond to his text messages because he was white. I didn't know what to do!!! These events occurred during my last class of my finals. **I WAITED TWO WEEKS AND CALLED THE SERGEANT INTO MY OFFICE AND TOLD HIM THAT HE COULD NOT DO THAT AGAIN. WE TALKED EVERYTHING OUT AND HE NEVER DID IT AGAIN. I COULDN'T GO TO THE COMMANDER OUT OF FEAR THAT SHE WOULD BLAME ME FOR ENTI[C]ING HIM OR SOMETHING NEGATIVE. The only thing she asked me about the situation was "What did you do?" I told her I handle [sic] the situation because I knew she didn't like or won't deal with confrontational issues. And she would not address anything I came to her about. . . . She never asked me the name of the sergeant.**

(Doc. No. 55-2, at 1 (emphasis in original).) Upon his receipt of this complaint, Johnson forwarded it to the MNPD Office of Professional Accountability ("OPA"), where it formed the basis for a formal investigation into the plaintiff's complaints against Lokey. (*See* Thaxter Decl., Doc. No. 70-1 ¶ 42.) Because the plaintiff believed that MNPD's HR department was biased against her, the investigation was eventually forwarded to Metro's HR Department. According to Metro HR's

Investigative Summary, the plaintiff "explained that she had been sexually harassed on two occasions by the same Metro MNPD Sergeant. She indicated that on the first occasion she had 'handled it.'" (Doc. No. 55-3, at 2.)

During her February 2020 deposition, however, the plaintiff expanded upon her allegations, claiming that, in addition to the inappropriate texts and phone calls she had previously identified, Howard had continued to make her uncomfortable just by being in the precinct offices when she arrived early each day to begin her shift and he had not yet left. She stated that she told two other sergeants under her supervision around April 2015 about Howard, as a result of which they "sort of ran interference and kept him away from [her] in the office." (Thaxter Dep. 43, Doc. No. 55-1, at 8.)

In her May 2020 Declaration, prepared in response to the defendants' Motion for Summary Judgment, the plaintiff provides yet more detail. She claims that, in February 2015, Howard began "sending [her] frequent text messages." (Doc. No. 70-1 ¶ 20.) Initially, the emails were flirtatious and made her uncomfortable. (*Id.* ¶ 21.) She claims that Howard made "numerous advances" and that, after she rebuffed them, he "harassed" and "cursed" at her. (*Id.*) After that, she "received numerous calls throughout the months, including weekends, late at night and early in the morning." (*Id.*) She states that he sent texts as well that "became progressively concerning and aggressive." (*Id.* ¶ 22.) She began locking her office door if he was in the precinct offices at the same time as she was, because his presence "made her uncomfortable." (*Id.* ¶ 25.) She again claims that she "notified" two sergeants on her shift about Howard's conduct. (*Id.* ¶ 23.) Although the sergeants were below her in the chain of command, they had a responsibility to notify a supervisor about her complaint of sexual harassment but failed to do so. (*Id.* ¶ 24.)

In addition to the reports to the sergeants and then to Lokey, the plaintiff claims she made

a third "report" of sexual harassment during a roll call meeting in August 2015, when she informed the sergeants and officers under her command that she "had been subjected to sexual harassment." (*Id.* ¶ 36.) She asserts that "each of the officers had a professional obligation to report allegations of sexual harassment." (*Id.*)

Finally, the plaintiff also alleges that Howard began sending her text messages again "on or around August and September 2015." (*Id.* ¶ 37.) These culminated on September 29, 2015, when the plaintiff received a text from David Howard that she perceived as "especially threatening," as it stated that "he would not put up with [her] ignoring or dismissing him." (*Id.* ¶ 38.) With her brother's assistance, she forwarded a screenshot of the message to OPA Captain Chris Gilder. (Doc. No. 68 ¶ 15.) Gilder immediately notified MNPD HR Director Sue Bibb, which resulted in an investigation by Howard's chain of command, OPA, and MNPD HR. (*Id.* ¶ 16.) Captain Ken Walburn, Sgt. Carlos Lara, Lt. Steve Lewis, and Bibb met with Howard the next day, on September 30, 2015. During that meeting, they advised Howard that his behavior was inappropriate and unacceptable. Howard was ordered not to have any further contact with Thaxter and was offered training and counseling to deter such behavior from happening in the future. (*Id.* ¶ 17.) Howard never contacted Thaxter again after the September 29, 2015 text message. (*Id.* ¶ 18.) Due to another complaint by a civilian, Howard was decommissioned in January 2016 and ultimately terminated. (*Id.* ¶ 19.)

Meanwhile, based on the Summary of Complaints the plaintiff had submitted to Deputy Chief Brian Johnson, the OPA instituted a formal investigation into Lokey's conduct, focusing in particular on the plaintiff's allegation that Lokey had failed to act upon the plaintiff's report of sexual harassment. Lokey ultimately acknowledged that her decision not to proactively initiate an investigation was an error in judgment and a violation of MNPD's anti-harassment policy. (Doc.

No. 68 ¶ 13.) She accepted responsibility for failing to follow MNPD policy and received a four-day suspension. (*Id.* ¶ 14.)

In a supplemental Declaration, Captain Chris Gilder states that, after the plaintiff's deposition, he contacted the two sergeants with whom she had allegedly spoken about Howard's harassment. Both denied that Thaxter had ever complained to them about being sexually harassed. (Doc. No. 73 ¶¶ 6–7.) Nonetheless, Gilder reminded them that

> MNPD takes allegations of sexual harassment very seriously, and that all officers are expected to notify their commander and/or captain of any sexual harassment allegations of which they become aware, even if the complainant has not technically followed MNPD's reporting policy and even if the complainant is their superior.

(*Id.* ¶ 8.)

As pertains to both her First Amendment retaliation claim and her racial harassment claim, the plaintiff alleges that she sent Chief Anderson an email on August 14, 2015 (Doc. No. 70-3), which she refers to as her "Diversity Letter." (Doc. No. 70-1 ¶ 34.) As she describes it, the Diversity Letter explained "various racial and gender diversity shortfalls" in several specific MNPD departments or divisions. (*Id.*) While criticizing a lack of diversity in those divisions, the plaintiff also emphasized her belief that the MNPD is a "great department." (Doc. No. 70-3, at 3.) And, although she mentioned that she had witnessed the "mistreatment of others," the plaintiff did not claim to have been a victim of racial or sexual harassment in her Diversity Letter. (*Id.*)

Just after she sent that letter, the plaintiff learned that Sergeant Jason Spencer, the same individual with whom she had had numerous difficulties and disciplinary issues over the course of the preceding year, was calling her "Hitler" or "a Nazi" with his "flex group." (Thaxter Dep. 126, 128, Doc. No. 55-1, at 34–35.) She was very upset about this name-calling and felt that the officers under her command were "teaming up" on her, despite everything she had done to be supportive of them. (*Id.* at 126, Doc. No. 55-1, at 34.) She knew she could not go to Lokey with a complaint

about Spencer and instead decided to address it during a roll-call meeting the next day with the officers and sergeants under her command. She emailed them ahead of time to schedule the meeting. She was still angry when she went into the meeting. (*Id.* at 128–29, Doc. No. 55-1, at 35–36.) During this meeting, she accused the officers of being racist and sexist and told them that bad things happened to people who mistreated her. (*Id.* at 129, 133, Doc. No. 55-1, at 36, 40.) Sergeant Spencer secretly video-recorded the meeting on his telephone.

According to Metro HR's Investigative Summary of its interviews of the plaintiff in connection with her complaint against Lokey (Doc. No. 55-3), the plaintiff "raised the name-calling issue" during the roll-call meeting, told the officers that she had been sexually harassed, and stated her opinion that "MNPD was not doing enough to support minorities and women as they tried to advance through the ranks." (Doc. No. 55-3, at 8.) During interviews with Metro HR that took place on December 15, 2015 and February 1, 2016, Thaxter reported her belief that the name-calling by Spencer and others was "their reaction to being supervised, cautioned and disciplined by a black female Lieutenant who ran things by the book." (*Id.*) She later learned that Spencer was the person who had video-recorded the roll-call meeting and had forwarded a copy of the video to Sgt. Danny Hale, President of the local chapter of the Fraternal Order of Police ("FOP"), a "mostly white and male union organization of police officers." (*Id.*) Hale told Lokey about the video. Thaxter believed that Lokey then forwarded a copy of the video to Deputy Chief Johnson and possibly to the OPA and MNPD HR. (*Id.*) The plaintiff complained that Lokey did nothing to investigate the plaintiff's allegations of race and sex discrimination raised during the roll-call meeting and instead asked the sergeants who attended the meeting if any of them wanted to raise complaints against the plaintiff. Two of them, including Spencer, chose to do so, alleging defamation of character and "inefficiencies of duty." (*Id.* at 9.) The plaintiff believes that MNPD's

Black, male lieutenants would not have been similarly investigated. (*See id.* ("[Lt. Thaxter] told the OPA investigator . . . that MNPD 'wouldn't do this to Lt. McClain (black male), Lt. Moultry (black male)[,] Lt. Green (black male) or Lt. McCall (black male)'").) According to Metro HR's Investigative Summary, Thaxter reported that, after learning on September 5, 2015 of the OPA complaints against her arising from statements she made during the roll-call meeting and that Lokey was involved in the complaints and had forwarded the video to OPA, Thaxter filed her complaint against Lokey for failure to supervise, hostile work environment, discrimination, and "retaliation for doing [her] job." (*Id.* (referring to Thaxter's September 2015 Summary of Complaints sent to Deputy Chief Johnson, Doc. No. 55-2).)

The plaintiff filed her EEOC charge online on October 25 and actually signed it on November 11, 2015, alleging discrimination based on race and sex. (Doc. No. 55-8.)

The plaintiff went to some type of training for most of October and the early part of November 2015, while the various OPA complaints, both generated by her and instituted against her, were pending. On November 19, 2015, a week or two after she returned from training and just a few days after she finalized her EEOC charge, Chief Anderson called her into his office and informed her that she was being transferred to the Youth Services Division effective December 1, 2015. (Thaxter Dep. 65, Doc. No. 55-1, at 20.) According to Thaxter, she told Anderson she did not want to move, and they "talked in detail about why" he believed the transfer was necessary. (*Id.*) She protested that it was not a lieutenant position and that, if he made it a lieutenant position for her, it would "make things worse," because "everyone already said . . . the chief favored [her]." (*Id.*)

According to Anderson, the video of the August 18 roll-call meeting led by Thaxter had come to his attention sometime during the fall of 2015. (Doc. No. 68 ¶ 20.) Anderson characterized

the video as showing the plaintiff "essentially accus[ing] her subordinate sergeants and officers as being racist and constantly trying to undermine her." (Anderson Decl., Doc. No. 58 ¶ 3.) He perceived the plaintiff's demeanor to be "emotional and aggressive," and she appeared to him to be "berating her subordinates." (*Id.* ¶ 5.) While the plaintiff disputes that she "berated" her subordinates or appeared aggressive (*see* Doc. No. 68 ¶ 22, Response), she does not dispute the content of the speech, and she admits that she was "too angry" and "should have left." (Pl. Dep. 129; Doc. No. 55-1, at 36.)[4]

The video of the roll-call meeting led Anderson to believe that the plaintiff could no longer work at the Midtown Precinct supervising the sergeants who were present during the meeting. (Doc. No. 58 ¶ 6.) Anderson nonetheless believed that Thaxter could still be a successful leader within MNPD if placed in the right situation. (*Id.*) To that end, he created a lieutenant position within the Youth Services Division especially for Thaxter and transferred her to that position. He believed that, in that position, "she could excel under the tutelage of Captain Gordon Howey, who had a reputation . . . for being an excellent mentor and supportive supervisor." (*Id.* ¶ 7.)

The plaintiff initially expressed to Anderson that she did not want to transfer. (Doc. No. 70-1 ¶ 46.) She contends that she had already been approved, as of November 15, 2015, to re-bid for assignment out of Midtown Precinct and transfer to East Precinct, which she claims would have permitted her to transfer in January 2016. (*Id.* ¶ 45.) Thus, in her opinion, there was "no legitimate reason" to transfer her just before that. (Doc. No. 68 ¶ 22 Response.)

Thaxter reported to Youth Services effective December 1, 2015. (Doc. No. 70-1 ¶ 47.) She got along well with her supervisor, Captain Howey, and described her new post as a "nice" position that provided a better working environment than she had had at the Midtown Precinct. (Doc. No.

---

[4] Neither party introduced the video into the court's record.

68 ¶ 24.) The transfer was not a demotion, since she maintained her rank as a lieutenant. (Thaxter Dep. 171, Doc. No. 55-1, at 56.)

At the time he transferred Thaxter, Anderson was unaware of the nature of her pending OPA complaint against Lokey and was also not aware that she had made a complaint of sexual harassment. (Doc. No. 58 ¶¶ 8–9.) There is also no evidence in the record suggesting that he was aware when he transferred her that the plaintiff had filed an EEOC complaint.

While things were otherwise going well for Thaxter in the Youth Services Division during December 2015, the various investigations were still ongoing and a new one arose. Specifically, the OPA charged Thaxter with untruthfulness arising from its investigation into the plaintiff's claims against Lokey, based in particular upon the plaintiff's allegations that Lokey "never" sat down with her to discuss her evaluations or any other matter. (*See* Thaxter Dep. 191, Doc. No. 55-1, at 63.) According to Captain Gilder, the OPA investigation was based on inconsistencies between Thaxter's statements to OPA and documentation of "meetings with Commander Lokey that came to light as part of Plaintiff's complaints against Commander Lokey." (Doc. No. 59 ¶ 10; *see also* Doc. No. 70-2 (emails produced in discovery documenting communication and meetings between Thaxter and Lokey).) Upon initiation of the new complaint, the plaintiff was told that she would be assigned to the Records Division during the pendency of that investigation. (Doc. No. 59 ¶ 11.) According to Gilder, "[i]t is standard procedure to decommission an officer charged with untruthfulness and to place that person in a civil position pending outcome of an investigation into alleged dishonesty because untruthfulness/dishonesty is a terminable offense that MNPD takes incredibly seriously." (*Id.* ¶ 12.)

Around the same time that this charge arose, the video of the August 18 roll-call meeting was leaked to the local press sometime in December 2015, resulting in some negative news

coverage about the plaintiff. The plaintiff believes that Danny Hale was responsible for the leak, although she does not explain why. (Doc. No. 70-1 ¶ 49.) She requested that OPA investigate the source of the leak, but no investigation occurred. (*Id.* ¶ 51.) Since the plaintiff did not receive any help from the OPA with investigating the source of that leak, she wrote a letter, to which the plaintiff refers as the "Public Interest Letter," and sent it to the FBI, DOJ, NAACP, the Mayor's Office, and a local news station, around January 1, 2016. (*Id.* ¶ 52; *see* Doc. No. 55-5.) The plaintiff did not sign her name to the letter. Instead, the letter was written on letterhead purporting to be that of FOP President Danny C. Hale, and it shows Hale's name and telephone number at its conclusion. (Doc. No. 55-5.) There is no dispute, however, that the plaintiff wrote and distributed the letter. (*See* Thaxter Dep. 159–61, 167, Doc No. 55-1, at 51–53.) Hale was alerted to the existence of the letter when various news outlets called him about it, after which he contacted the MNPD Fraud Unit to investigate and determine who had sent the letter purporting to be from him. On January 5 or 6, 2016, the MNPD Fraud Unit began its investigation. At some point, the investigation was referred to the FBI. (*See* Doc. No. 70-2, at 23–26, 28–29.) Fingerprints lifted from one of the letters implicated the plaintiff as the sender of the letter fairly early during the investigation, around January 13, 2016. (*See* MNPD Fraud Investig. Rep., Doc. No. 70-2, at-24.)

The plaintiff's last physical day of work for MNPD was January 7 or 8, 2016, when she went on FMLA leave. (Pl. Dep. 119, Doc. No. 55-1, at 31; Doc. No. 68 ¶ 27.) She chose to take FMLA leave rather than report to the Records Division. ((Pl. Dep. 179, Doc. No. 55-1, at 60.) She notified Anderson by letter dated May 5, 2016 of her resignation or "retirement" from the MNPD effective May 17, 2016, when her FMLA leave expired. (*See* Doc. No. 55-7.) However, because she was permitted to continue to use sick leave and accrued vacation time, she technically remained employed, and continued to be paid, through September 20, 2016. (Doc. No. 68 ¶ 28; Doc. No.

70-1 ¶ 60.)

During this time, the fraud investigation into the sending of the Public Interest Letter was ongoing. On May 20, 2016, the plaintiff was indicted by a Davidson County grand jury on two counts of forgery in connection with the Public Interest Letter; she was subsequently arrested. (Doc. No. 55-6; Thaxter Dep. 161, Doc. No. 55-1, at 53.) The plaintiff alleges that she was required to make over twenty court appearances during the course of the criminal proceedings against her, but Hale, the alleged victim of the forgery, never appeared at a single hearing. The case against her was finally closed or retired, without a conviction, in February 2019. (Doc. No. 70-1 ¶¶ 61, 62.)[5]

According to Anderson, he "would have had no choice but to recommend terminating Lt. Thaxter upon her indictment for forgery." (Doc. No. 58 ¶ 58.)

When asked to identify what retaliatory actions had been taken against her, the plaintiff responded that Lokey had gone into her office without her permission, shortly before her move to Youth Services, and moved things around, "touching [her] personal stuff" and laying face-down a photograph of the plaintiff's recently deceased mother. (Thaxter Dep. 144–45, Doc. No. 55-1, at 43–45.) When asked why Lokey retaliated against her, the plaintiff's explanation, again, was simply that she "wasn't a team player" for Lokey and their leadership styles were incompatible. (*Id.* at 150, Doc. No. 55-1, at 46).

When asked if Anderson retaliated against her, Thaxter, besides referring to her reassignment to Youth Services, noted her belief that Anderson had transferred her to records "within eight days of me writing that letter," referring to the Public Interest Letter. (Thaxter Dep.

---

[5] The proceedings related to these criminal charges against the plaintiff caused the stay of this case for nearly two years.

158, Doc. No. 55-1, at 50.) She apparently also believed that the move was in retaliation for her having made various internal complaints against Lokey and others, noting that, despite her complaints against them, Spencer and Lokey were not transferred or decommissioned during the investigations against them. (*Id.* at 159, Doc. No. 55-1, at 51.) Anderson, however, expressly denies having any role in the plaintiff's transfer to the Records Division. (Doc. No. 58 ¶ 10.) The plaintiff also now contends that the forgery investigation, indictment, and prosecution were retaliatory actions. (*See* Doc. No. 70-1 ¶ 63.) In his Supplemental Declaration, Chris Gilder attested that "MNPD does not make decisions about whether to prosecute crimes." (Doc. No. 73 ¶ 9.) Instead, "[f]or state law crimes, that decision is made by the District Attorney's Office, which is a state agency." (*Id.*)

## III. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## IV.     DISCUSSION

### A.     Title VII Sexual Harassment Claim

To establish a *prima facie* case of sexual harassment based on hostile work environment, the plaintiff must present evidence demonstrating that

> (1) she is a member of a protected class (female); (2) she was subjected to harassment, either through words or actions, based on sex; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009) (quotation marks and citation omitted). The defendants argue that the plaintiff cannot establish the third and fourth elements of her claim.

### 1.  Whether the Harassment Was Sufficiently Severe and Pervasive

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 273 (citation omitted). In other words, the plaintiff must make "a showing that the environment is objectively hostile and the harassment subjectively severe and pervasive." *Id.* at 274. In considering whether the plaintiff can meet this standard, courts should "view the workplace as a whole," without placing undue emphasis on whether the plaintiff was physically threatened or whether her workplace performance declined. *Id.* at 273.

The defendants argue that the facts as alleged in the September 2015 Summary of Complaints submitted to Deputy Chief Johnson and the OPA show that Thaxter "had been sexually harassed on two occasions" by Sgt. Howard, that she had "handled" it the first time, and that the second time did not occur until several months later, when he sent her a text saying that he "would not be ignored." (*See* Doc. No. 56, at 10–11.) The defendants assert that such "sporadic communications over a matter of months that occurred outside the workplace," although "reprehensible," could not constitute severe and pervasive harassment.

As noted above, the plaintiff's allegations regarding Howard's behavior have changed fairly dramatically over time. In her Summary of Complaints to Johnson, she claimed only that an unnamed sergeant had called her, sounding drunk, on "two separate nights cursing, talking about sex, and going off on [her]." (Doc. No. 55-2, at 1.) She waited two weeks before calling him into

her office and talking with him. After she talked to him, "he never did it again." (*Id.*) If this were all that happened (up until the text message she received on September 29, 2015, which Thaxter immediately reported and which was immediately addressed), this behavior would not be sufficiently severe or pervasive to give rise to a sexual harassment claim. By the time of her deposition, however, the plaintiff was alleging that Howard's telephone calls and texts had continued and made her uncomfortable enough that she told two of her sergeants about it, and they "ran interference" for her. (Thaxter Dep. 43, Doc. No. 55-1, at 8.) In the Declaration prepared in support of her Response to the defendant's Motion for Summary Judgment, the plaintiff alleged that the behavior was continuing up until she reported it to Lokey and, although it stopped while she was in Boston for training in July 2015, it resumed in August and September, culminating in the "threatening" text that prompted her to alert Chris Gilder about it. She claims that Howard's harassment was severe enough that she locked her office when she was in the precinct at the same time as he was.

Although the plaintiff's escalating description of Howard's conduct will certainly affect her credibility at a trial, at this juncture it is not the court's job to assess her credibility. *See Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010)( "[I]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. [W]hen the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true. *This is the case even when the nonmovant's account is contradictory*." (emphasis added; internal quotation marks and citations omitted)); *see also Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 340 (6th Cir. 2008) (noting that, for summary-judgment purposes, inconsistencies in plaintiff's allegations "go to the weight of her testimony, not its admissibility"). Accordingly, the court finds that Thaxter has created a material factual dispute as to whether

Howard's conduct created an objectively hostile work environment and as to whether Thaxter subjectively experienced it as sufficiently severe and pervasive. *Accord Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016) ("[W]hether harassment was so severe and pervasive as to constitute a hostile work environment [is] quintessentially a question of fact." (citation and internal quotation marks omitted).

          2.       *Whether the Employer May Be Liable*

The defendants also contend that the plaintiff cannot "carry her burden of showing that MNPD responded with indifference or unreasonableness to her alleged harassment by Sgt. Howard," as required to establish that Metro is liable for the alleged harassment. (Doc. No. 56, at 11.)

"[E]mployers are not automatically liable for sexual harassment perpetrated by their employees." *Gallagher*, 567 F.3d at 274. When the perpetrator of the alleged harassment is a non-supervisory co-worker, "an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Id.* Thus, "[a]n employer is vicariously liable for co-worker harassment of which it knew or should have known if it failed to take appropriate remedial action, *i.e.*, if its response manifests indifference or unreasonableness." *Id.* at 276 (citations omitted). An employer is "deemed to have notice of harassment reported to any supervisor or department head who has been authorized . . . to receive and respond to or forward such complaints to management." *Id.* at 277. And an employer's response to a report is generally deemed to be "adequate if it is reasonably calculated to end the harassment." *Smith*, 813 F.3d at 311 (quoting *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814 (6th Cir. 2013)).

The plaintiff alleges that she told two of her sergeants about Howard's conduct sometime in April 2015. Although the sergeants deny that she did, their denial simply creates a material

factual dispute as to whether (and what) she did, in fact, tell them. In addition, the defendants implicitly concede that the sergeants, even though they were Thaxter's subordinates, were "authorized [by MNPD] to receive and respond to or forward such complaints to management." *Gallagher*, 567 F.3d at 277. The sergeants' alleged response to the report—agreeing to "run interference" for the plaintiff—does not appear to have been reasonably calculated to end the harassing conduct. Whether that response was reasonable would depend upon a number of facts that the parties have not developed or that are disputed: what exactly the plaintiff told the sergeants, whether they knew the harassing conduct was ongoing, and what responsibility the plaintiff herself had to report the conduct up the chain of command, in light of her undisputed knowledge of the defendant's policy regarding harassment and discrimination.

Likewise, it is undisputed that Thaxter reported the sexual harassment to Lokey, her direct supervisor, in June 2015. The reasonableness of Lokey's response—asking the plaintiff only "what did you do?" (Doc. No. 55-2, at 1)—depends in large part on what the plaintiff actually told Lokey, which is disputed. Thaxter claims she told Lokey that she was "handling" the situation, thus implying it was ongoing; Lokey claims that Thaxter told her she had "handled" it, thus implying that it had occurred in the past and that no further action was necessary. And, in either event, a reasonable jury might or might not be persuaded by Lokey's explanation for why she did not delve further into the issue in a proactive way. Her claim that, as a woman in a male-dominated field, she was sensitive to the plaintiff's apparent desire to handle the matter herself actually cuts two ways. A reasonable jury might conclude that a female supervisor of another woman in a male-dominated profession should know that sweeping such matters under the rug is not necessarily the most effective solution, even if that is the victim's impulse.

In sum, there is a question of fact as to whether Lokey's and the sergeants' responses to the plaintiff's claim of sexual harassment "manifest[ed] indifference or unreasonableness," *Gallagher*, 567 F.3d at 276, and thus as to whether Metro is vicariously liable for the alleged harassment. Metro is not entitled to summary judgment on this claim.

## B.      Title VII Race Discrimination Claim

The defendants argue that Thaxter's claim that she was subjected to a racially hostile work environment, set forth in the Amended Complaint, is time-barred and that, even if it were not time-barred, the plaintiff has not alleged facts to support any of the *prima facie* elements of her racial harassment claim.

### 1.      Statute of Limitations

The plaintiff filed her EEOC Charge of Discrimination on November 11, 2015. (Doc. No. 55-8; Doc. No. 70-1 ¶ 44.) On this form, the plaintiff checked the boxes to indicate that she was alleging discrimination and retaliation based on both sex and race. (Doc. No. 55-8.) The plaintiff received notice of her right to sue on these claims on August 15, 2016. (Doc. No. 55-9.) The right-to-sue letter also notified her that she had the "right to institute a civil action under Title VII . . . within 90 days of [her] receipt of [the] Notice." (*Id.*)

The plaintiff filed suit on October 26, 2016, within ninety days of her receipt of the right-to-sue letter. (Doc. No. 1.) While the original Complaint unambiguously set forth a cause of action under Title VII for sexual harassment, and alleged facts to support that claim, it did not purport to state a claim based on race discrimination or a racially hostile work environment, nor did it allege facts to support such a claim. The original Complaint, in fact, does not mention the word race or even reveal the fact that the plaintiff is an African American woman. It refers to race tangentially in just two paragraphs, both involving the plaintiff's problems with Sergeant Jason Spencer. First, the plaintiff alleges that she held a "closed door meeting" with four Midtown sergeants to discuss

Spencer's "videotaping three black officers in his segment." (Doc. No. 1 ¶ 22.) Second, she states that she met with HR to discuss the same videotaping incident. (*Id.* ¶ 28.) These two references do not imply or suggest that Spencer or anyone else was harassing the plaintiff on the basis of race, or even that his videotaping the three other officers constituted racial harassment of them. Similarly, although the plaintiff mentions "hostile work environment" several times in the original Complaint, she does not allege any facts suggesting that the hostile work environment was based on race, as opposed to sex or mere personal animosity.

After defendant Metro filed its first Motion to Dismiss in January 2017, the plaintiff filed her Amended Complaint on February 7, 2017, asserting, for the first time, a cause of action under Title VII for race discrimination based on a racially hostile work environment and including a few additional facts in support of such a claim. (Doc. No. 15.) The Amended Complaint was filed substantially more than ninety days after the plaintiff's receipt of the right-to-sue letter.

"To pursue Title VII claims in federal court, a plaintiff must file a complaint within 90 days of receiving a right-to-sue letter from the EEOC." *Hollimon v. Shelby Cty. Gov't,* 325 F. App'x 406, 409 (6th Cir. 2009) (citing 42 U.S.C. § 2000e-5(f)(1)). "Although the time limit to file a Title VII action is not jurisdictional, it is still a condition precedent to filing an action in federal court." *Page v. Metro Sewer Dist.*, 84 F. App'x 583, 585 (6th Cir. 2003) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *Banks v. Rockwell Int'l N. Am. Aircraft Operations*, 855 F.2d 324, 326 (6th Cir. 1988)). "[C]ourts must strictly enforce[] Title VII's ninety-day statutory limit," and failure to file a complaint within that ninety days will entitle the defendant to judgment as a matter of law. *Rembisz v. Lew*, 830 F.3d 681, 683 (6th Cir. 2016).

In this case, although the plaintiff filed suit within the ninety-day limitations period, she did not file the Amended Complaint stating a claim for race discrimination until well after the

limitations period expired. Under these circumstances, the claim is time-barred unless the claims in the Amended Complaint relate back to the original Complaint under Rule 15 of the Federal Rules of Civil Procedure. *See* 6A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1496 (3d ed.) ("[S]ince the requirement that a discriminatory employment-practices suit must be brought within 90 days after the receipt of a right-to-sue letter is, in effect, a statute of limitations, a proposed amended complaint filed subsequent to that period may be allowed only if it meets the requirements of Rule 15(c)."); *accord Lock v. FedEx Corp. Servs., Inc.*, No. 15-CV-02647-STA-TMP, 2015 WL 7018398, at *3 (W.D. Tenn. Nov. 12, 2015) ("[D]iscrimination claims raised for the first time in an amended pleading and outside of the 90-day time limit for filing suit are time-barred.").

Under Rule 15(c)(1)(B), "[a]n amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Thus, the Amended Complaint will relate back only if its claims arise from the "conduct, transaction, or occurrence" set out, or attempted to be set out, in her original Complaint. *Id.*

Rule 15(c)(1)(B) does not define "conduct, transaction, or occurrence," but the Sixth Circuit has focused on factual allegations, rather than specific causes of action or legal theories, in applying this standard. *See, e.g.*, *Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 249 (6th Cir. 2000) (finding relation back where the claims in the amended "complaints concerned the same time period and same injuries" and thus arose out of the same "conduct, transaction, or occurrence" as the original claims, and the "amended complaints simply [pleaded] with more specificity that which appeared in the original complaints," but noting that "a claim with entirely different 'operative facts' will not relate back"). In addition, however, the Sixth Circuit has made it clear

that a court's analysis of whether a new claim relates back "is guided by 'whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading.'" *Durand v. Hanover Ins. Grp., Inc.*, 806 F.3d 367, 375 (6th Cir. 2015) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 516 (6th Cir. 2007)); *see also Bledsoe*, 501 F.3d at 516 ("The criterion of relation back is whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one." (quoting *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 573 (7th Cir. 2006)); *Hayward v. Chemours Co.*, No. 2:16-CV-02694-SHM, 2018 WL 718546, at *4 (W.D. Tenn. Feb. 5, 2018) (denying the plaintiff's motion to amend his complaint to add a claim for color discrimination, in addition to his original claim for race discrimination, where the original complaint did not allege color discrimination or any facts in support of a color discrimination claim); *Lock*, 2015 WL 7018398, at * 3 (dismissing an ADA claim as time-barred where it was alleged in the amended but not the original complaint, and there was no relation back because the original complaint "ma[de] a passing reference to medical leave" but "never mention[ed] disability discrimination").

In the case at bar, although many of the operative facts giving rise to the plaintiff's First Amendment retaliation, TPPA, sex discrimination and hostile work environment claims appear to be the same as those the plaintiff believes support her race discrimination claim, the court cannot find relation back, simply because, as set forth above, the plaintiff does not even reference her race in the original Complaint or provide facts that, if true, would remotely suggest that the allegedly hostile actions taken against her were based on race. Because the original Complaint did not allege facts to support a race discrimination claim, there was nothing in it to put the defendants on notice

of a potential race discrimination claim,[6] there is no relation back, and the claims for race discrimination and racially hostile work environment are time-barred. Metro is entitled to judgment in its favor on this claim.

            2.    *Prima Facie Case*

The court also finds, in the alternative, that the plaintiff has failed to establish a *prima facie* case of race discrimination.

To show that she was subjected to a racially hostile work environment, the plaintiff must first show that (1) she was a member of a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on race, (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment, and (5) the employer is liable. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009). The defendant argues that the plaintiff cannot establish any of these elements, aside from her membership in a protected class. In response, the plaintiff argues that she notified the defendant that she believed she was being discriminated against by Commander Lokey based on her race (*see* Doc. No. 70, at 23 (citing Metro HR's December 3, 2015 Fact Finding Report, Doc. No. 70-2)), and also notified Chief Anderson in her Diversity Letter "of the racial and gender disparities

---

[6] Of course, the EEOC charge put defendant Metro on notice of a claim of discrimination based on race, but that did not suffice to put it on notice that Thaxter wished to continue to pursue this claim in her lawsuit. The court is cognizant that the Sixth Circuit applies the relation-back doctrine liberally and that matters outside the pleadings may be considered in determining whether a defendant has the requisite notice. *See Bledsoe*, 501 F.3d at 517 (authorizing consideration of a Disclosure Statement filed in conjunction with a *qui tam* action for purposes of relation back). In this case, however, the EEOC charge failed to allege facts supporting a claim for racial harassment, as it stated only that "Lokey shows favoritism on how she disciplines one of my black sergeants verses [sic] one of my white sergeants." (Doc. No. 55-8.) Under these circumstances, the court finds that the EEOC charge, even considered in conjunction with the original Complaint, did not provide notice of the plaintiff's intent to pursue a racial harassment claim.

she saw, explaining the various racial and gender diversity shortfalls of several of Defendant's departments (*id.* (citing Diversity Letter, Doc. No. 70-3)).

For purposes of the second element of her *prima facie* case, the plaintiff must make "a showing that the environment is objectively hostile and the harassment subjectively severe and pervasive." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir. 2009). While the court finds that the plaintiff has created a fact issue as to whether she subjectively experienced the allegedly harassing conduct as severe and pervasive, the facts viewed in the light most favorable to her do not establish an objectively hostile environment. She alleges a number of incidents of insubordinate behavior, or errors that she had to correct repeatedly, by four or five sergeants under her supervision, taking place over the course of a year. And she alleges that her supervisor failed to provide support and assistance to her in dealing with her subordinates over the course of that same time period. Accepting all the facts as alleged by the plaintiff to be true, as set forth above, the court finds as a legal matter that these facts do not establish the existence of an objectively hostile working environment. Rather, they show that the plaintiff was required to deal with a fairly ordinary scope of disciplinary issues in her role as a supervisor.

Regardless, even if the court assumes the existence of a material factual dispute as to the second element, the plaintiff has not shown or created a material factual dispute as to whether the allegedly hostile behavior she experienced was based on race. Regarding this element, although the plaintiff does not allege that she was ever the target of racial epithets or overtly racist behavior, the Sixth Circuit recognizes that "[c]onduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (citation omitted). To show that race was the

basis of the conduct about which she complains, however, the plaintiff must rely on actual evidence rather than mere speculation and supposition. *See id.* at 706–07 (finding that the plaintiff's allegations were not so speculative as to warrant summary judgment for the defendant where "[a] fair reading of at least one of the affidavits" she submitted established that white employees were not disciplined for engaging in the same conduct for which the plaintiff was disciplined).

In this case, the plaintiff has not pointed to any non-speculative evidence to substantiate her claim that the harassment she allegedly experienced was based on race. Thaxter has alleged numerous instances of insubordinate behavior by some of the sergeants under her command, particularly Sergeant Jason Spencer, and Lokey's failure to support her in responding to such insubordination. Thaxter claims that her Summary of Complaints to Deputy Chief Johnson encompassed a claim "regarding the racial discrimination" to which she was "subjected . . . by Commander Lokey." (Doc. No. 70-1 ¶ 42.) As set forth above, however, that document does not remotely, even by inference, provide notice that Thaxter was suffering harassment based on race or a racially hostile work environment. Instead, the plaintiff complained that Lokey was not supporting her authority and was generally an incompetent commander. And, although the plaintiff alleges in her Amended Complaint that Lokey treated her differently than she treated white employees under her command, in her deposition Thaxter could not point to any specific incidents of differential treatment. Rather, again, she made clear her belief that Lokey was simply an incompetent leader who was incapable of taking decisive action under any conditions. Similarly, regarding Spencer, Thaxter could not point to incidents in which he treated white supervisors differently. In fact, in the Summary of Complaints, Thaxter alleged that he did not "want to be supervised by anyone." (Doc. No. 55-2, at 3; *see also* Thaxter Dep. 85, Doc. No. 55-1, at 22 (noting

that Lt. David Leavitt did not want to supervise Spencer either, because Spencer was "lazy, calling in sick frequently, and not a good Sergeant").)

Aside from her gut feelings, the plaintiff has been unable to point to any specific facts to substantiate her claim that the harassment she experienced was based on her race. On this basis as well, the court finds that Metro is entitled to summary judgment in its favor on the plaintiff's racial harassment/hostile work environment claim.

### C.      First Amendment Retaliation Claim

The defendants argue that the First Amendment claim against the individual plaintiffs, as distinct from the claim against Metro, is time-barred. Regarding the claim asserted against Metro, they argue that the First Amendment claim fails on the merits, because the plaintiff cannot establish that she engaged in protected speech or that she suffered any adverse actions as a result of her speech.

#### 1.      *The Merits of the Claim*

For a public employee to establish a *prima facie* case of retaliation in violation of the First Amendment, she must show:

> (1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.

*Boulton v. Swanson*, 795 F.3d 526, 530–31 (6th Cir. 2015) (quoting *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000)). As set forth above, the defendants argue that the plaintiff cannot establish any of these elements.

In analyzing a public employee's First Amendment retaliation claim, to determine whether the employee engaged in protected speech, a district court must consider whether the employee spoke (1) as a citizen rather than as a public employee and (2) "on a matter of public concern."

*Boulton*, 795 F.3d at 531 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). If both of those questions are answered in the affirmative, the court must then "balance the justifications for a speech restriction against the employee's free speech interest" to determine whether the speech was privileged. *Id.* In the Sixth Circuit, whether a public employee's speech is protected is a question of law. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 464 (6th Cir. 2017).

Regarding the first component, the Supreme Court has explained that a public employee does not speak "as a citizen" when he "make[s] statements pursuant to [his] official duties." *Garcetti*, 547 U.S. at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22.

In *Lane v. Franks*, 573 U.S. 228, (2014), the Court rejected an expansive reading of *Garcetti*:

> *Garcetti* said nothing about speech that relates to public employment or concerns information learned in the course of public employment. . . . In other words, the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.

*Lane v. Franks*, 573 U.S. 228, 240 (2014). The Sixth Circuit has recognized, following *Lane*, that "the *Garcetti* exception to First Amendment protection for speech [that] 'owes its existence to a public employee's professional responsibilities' must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton*, 795 F.3d at 534. Thus, in *Boulton*, for example, it was "axiomatic that an employee's job responsibilities do not include acting in the capacity of a union member, leader, or official" and, therefore, that "speech

in connection with union activities is speech 'as a citizen' for the purposes of the First Amendment." *Id.* at 534. The Sixth Circuit has stressed that the inquiry into whether an individual spoke as a public employee or as a private citizen "is a practical one," requiring consideration of both the "content and context" of the speech. *Mayhew*, 856 F.3d at 464 (quoting *Garcetti*, 547 U.S. at 424; *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010)).

Whether an employee's speech addressed a matter of public concern likewise "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 140–41 (1983). The Sixth Circuit has emphasized that the courts should determine "the *point* of the speech in question." *Boulton*, 795 F.3d at 534 (quoting *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1187 (6th Cir. 1995)). In the context of personnel disputes, the court has recognized that, "[a]lthough government effectiveness and efficiency could generally be considered a matter of public concern, . . . assertions of incompetence and poor management decision-making [are typically] run-of-the-mill employment disputes— particularly when the recommended course of action would benefit the employee." *Boulton*, 795 F.3d at 532 (citations omitted). On the other hand, speech that "alleges corruption and misuse of public funds, failure to follow state law, major state policy decisions, or discrimination of some form" has been found to address matters of public concern. *Id.* (internal citations omitted). More broadly, the Supreme Court has recognized that "[s]peech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241.

If an employee's speech was both made in her capacity as a private citizen and addressed a matter of public concern, to determine whether the speech is protected by the First Amendment,

the court must also apply the test developed in *Pickering v. Board of Education*, 391 U.S. 563 (1968). *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017). "The *Pickering* balancing test is used 'to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer.'" *Id.* (quoting *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). The test requires weighing "the employee's interest in 'commenting upon matters of public concern'" against "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Pickering*, 391 U.S. at 568). The balancing test is not performed "in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Gillis*, 845 F.3d at 684 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

In the Amended Complaint, the plaintiff asserts that she engaged in protected speech by "speaking about matters of public concern regarding unethical and dangerous behavior in the workplace, including voicing concerns about sexual harassment by government employees, the willful ignorance of said conduct by supervisors in the government, and modification of internal complaints and investigations by government employees and police department officials." (Doc. No. 15 ¶ 51.) The pleading is somewhat vague, however, about what speech was protected.

In her Response in opposition to summary judgment, the plaintiff attempts to clarify what she believes to have been protected speech. Specifically, she points out that she "complained on numerous occasions of the race relations and lack of diversity fostered by" Metro, specifically by (1) "sending the Diversity Letter to Chief Anderson" dated August 14, 2015 (Doc. No. 70, at 26); (2) notifying the officers she supervised during the August 2015 roll-call meeting that "they were subjecting African American Lieutenants to racial discrimination, and that Plaintiff had been

subjected to sexual harassment as well as racial discrimination" (*id.*); and (3) sending the "Public Interest Letter to a local news station and law enforcement agencies" on or around January 1, 2016 (*id.* at 27).

Regarding her speech during the roll-call meeting, the court already ruled, in addressing the individual defendants' Motion for Judgment on the Pleadings, that the plaintiff could not state a First Amendment retaliation claim based on her verbal complaints made during that meeting. (*See* Doc. No. 53, at 13 ("Verbal complaints to the sergeants who reported to the plaintiff, communicated during an on-the-job meeting with those sergeants, clearly took place during and 'pursuant to' the plaintiff's job duties." (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 545 (6th Cir. 2007))).) The court readopts that position here and finds that, insofar as the First Amendment retaliation claim asserted against Metro (which did not join the individual defendants' Motion for Judgment on the Pleadings), is based on the plaintiff's speech during the roll-call meeting, it fails as a matter of law. That speech, undertaken while the plaintiff was on the job and made within the course and scope of the plaintiff's ordinary job duties, was not protected.

Regarding the August 2014 email to Chief Anderson, although it was apparently not made public, it does not seem to have been made in the course of the plaintiff's normal or *ad hoc* duties or to have been a complaint addressed up the chain of command. There is no evidence that it was made pursuant to the plaintiff's "professional responsibilities" or "in furtherance of the ordinary responsibilities of [her] employment." *Boulton*, 795 F.3d at 534. In addition, insofar as it addressed the plaintiff's perception of discrimination against, and the lack of opportunities for the professional advancement of, women and people of color within MNPD, the August 2014 email addressed matters of public concern. The defendant makes no effort to argue that the *Pickering* balancing test yields a conclusion that the speech is not protected. For purposes of the Motion for

Summary Judgment, the court finds that this email constitutes speech protected by the First Amendment.

The plaintiff, however, has not pointed to any causal connection between her email to Anderson and any adverse action taken against her. Moreover, even if it were plausible that Anderson's decision to transfer her to the Youth Services Division were causally related to the Diversity Letter, as set forth above, the transfer to the Youth Services Division was not an adverse action, because it did not cause an injury that "would likely chill a person of ordinary firmness from continuing to engage in [the protected] activity." *Boulton*, 795 F.3d at 530. The plaintiff initially did not want to be transferred, but the undisputed evidence shows that the transfer was not a demotion, as she was transferred at the same rank and pay; she enjoyed the work there, got along well with her supervisor, and later wished she could have remained in that position. Regardless of the fact that the plaintiff was worried about the effect such a favorable transfer might have on the pending complaints and investigations, it was not an adverse action. Accordingly, the defendants are entitled to summary judgment on the plaintiff's First Amendment retaliation claim to the extent it is based on the Diversity Letter.

The plaintiff also claims that her January 1, 2016 "Public Interest Letter" constituted protected speech. As set forth above, that Letter was written on letterhead purporting to be that of FOP President Danny C. Hale, and it shows Hale's name and telephone number at its conclusion. (Doc. No. 55-5.) The plaintiff admits that she wrote and distributed the Letter to various news media outlets, the mayor, and others. (*See* Pl. Dep. 159–61, 167, Doc No. 55-1, at 51–53.) The plaintiff insists that the Public Interest Letter was written in her capacity as a private citizen, as established by the fact that it was referred to the FBI for investigation, and that it concerned matters of public concern, including discrimination and sexual misconduct within the MNPD. The court

agrees: the letter was clearly written and distributed by the plaintiff acting in her capacity as a private citizen rather than as a public employee. The letter was sent to the mayor and various news outlets and thus was publicly disseminated, and it clearly was not authored by the plaintiff as part of her ordinary or *ad hoc* job duties. It also addressed matters of public concern, namely, the plaintiff's allegations that "Metro Officers are being promoted and transferred to prestige positions after being investigated for violating policy," including policies pertaining to discrimination and sexual misconduct. (Doc. No. 55-5, at 1.)

The question remains whether the plaintiff's interest in her First Amendment speech, with respect to this letter, outweighs the employer's interest in restricting the speech—or, in this case, punishing her in connection with the speech. Regarding this issue, the defendants assert that "a forged or, at best, misleading, communication that leads to the filing of criminal charges can hardly be deemed 'protected speech.'" (Doc. No. 56, at 19.) In response, the plaintiff offers only the fact that the MNPD did not punish Hale for "leaking" the video of her roll call speech to the media, which, she claims, demonstrated that it had "little interest in prohibiting such speech." (Doc. No. 70, at 29.)

The court finds no relation between Hale's dissemination of an actual video of the plaintiff, however ill-advised Hale's action might have been (if indeed it was Hale's), and the plaintiff's dissemination of a letter purporting to be written by Hale, or at least authorized by him, when it admittedly was not. To be clear: there is no dispute that Thaxter wrote and disseminated the letter; she simply denies that it was a forgery because she did not "sign" Hale's name, she only typed it. (*See* Pl. Dep. 160, Doc. No. 55-1, at 52 (claiming, "I didn't forge, I never signed it. . . . [F]orgery

is you sign it . . . .").)[7] And all of the evidence made available to the court establishes that the investigation concerning this letter involved, not the content of the letter, but the fact that it was written and distributed by someone else attributing it to Hale without his permission.

Moreover, while the plaintiff's actual motive in sending the letter is not entirely clear, she herself admitted during her deposition that, "[a]s a Christian," she regretted sending the letter, because it was "mean spirit[ed]." (Pl.'s Dep. 194, Doc. No. 55-1, at 66.) In her Declaration, she states that she sent the letter because Hale "did not receive disciplinary action" for disclosing the video of the roll-call meeting to the media. (Doc. No. 70-1 ¶ 52.) In other words, she was not motivated purely by a need to communicate the information in the Letter, nor does she claim that a fear of retaliation prevented her from sending it out in her own name. Instead, by her own admission, she appears to have been motivated, at least in part, by a desire for revenge against Hale for his having disseminated the video of the roll-call meeting. Under all of these circumstances, while Thaxter may have had some slight protectible interest in sending the letter, she did not have a protectible interest in sending it out under Hale's name.

The plaintiff has also not shown that Metro's or the MNPD's reaction to the letter— investigating its source and, according to the plaintiff, participating in her prosecution for forgery—was unreasonable. Thaxter admitted sending the letter under Hale's name, that is, that she made and disseminated a writing purporting to be by a person who did not actually authorize her to put his name on it. Regardless of the fact that the charges against her were ultimately dropped, it was not unreasonable to suspect that the plaintiff had engaged in forgery as defined by

---

[7] In fact, forgery is defined by Tennessee law to encompass "[a]lter[ing], mak[ing], complet[ing], execut[ing] or authenticat[ing] any writing so that it purports to . . . [b]e the act of another who did not authorize that act." Tenn. Code Ann. § 39-14-114(b)(1)(A)(i). The statute does not require a signature. And forgery is actionable as an offense if done "with intent to defraud or harm another." *Id.* § 39-14-114(a).

Tenn. Code Ann. § 39-14-114. (*See* Note 3, *supra*.) In sum, weighing Thaxter's interest in "commenting upon matters of public concern" against Metro's justification for restricting that speech, taking into consideration the manner, time, place, and context of the expression, *Gillis*, 845 F.3d at 684, the court finds that Metro's interest in investigating and prosecuting allegations of forgery outweighed the plaintiff's interest in publishing a letter that she intentionally and maliciously attributed to someone else. In light of all these considerations, the plaintiff did not have a protectible interest in the Public Interest Letter.

Finally, even if the court presumes that the Public Interest Letter constituted protected activity, the plaintiff has not shown a causal connection between the Letter and any purported adverse action by the defendants. Insofar as she contends that her decommissioning and transfer to the Records Division in January 2016 were in retaliation for the Letter, she fails to show that the persons responsible for those actions were aware at the time those actions were taken that she had written and published the Public Interest Letter.

She also contends that the investigation, indictment, and prosecution of her in connection with the Public Interest Letter were retaliatory, but she has not pointed to any evidence in the record suggesting that the investigation, in particular, resulted in any adverse action or that it was taken in reaction to the *content* of the Letter, that is, its protected component, as opposed to being taken in reaction to the fact that Thaxter submitted the Letter under someone else's name. Regarding the indictment, arrest, and prosecution for forgery, Thaxter has not pointed to any evidence showing that the MNPD or Metro participated in the decision to pursue those actions. The decision to prosecute belongs to the district attorney, and, in Tennessee, district attorneys general are state officials rather than municipal officials. *Sentell v. Tennessee*, No. 3:12-cv-593, 2013 WL 3820021, at *2 (E.D. Tenn. July 23, 2013); *see also Jarvis v. Hamilton Cty. Dep't of*

*Educ.*, No. 1:17-CV-00172, 2019 WL 1368618, at *8 (E.D. Tenn. Mar. 26, 2019) (same, citing Tenn. Code Ann. §§16-2-506, -508).

The defendants are therefore entitled to summary judgment on the plaintiff's First Amendment retaliation claim.

### 2. *The Claims Against the Individual Defendants*

In the alternative, the First Amendment retaliation claim against the individual defendants is barred by the statute of limitations.

The First Amendment retaliation claim is brought under 42 U.S.C. § 1983. In Tennessee, claims under § 1983 are subject to a one-year statute of limitations. Tenn. Code Ann. § 28-3-104(a)(3); *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005). The individual defendants were not named in the original Complaint; they were first named in the Amended Complaint, filed on February 7, 2017. Thus, to survive a statute-of-limitations challenge, the retaliation claims against the individual defendants must have arisen on or after February 7, 2016, unless they relate back to the original Complaint.

The plaintiff does not argue, and the court does not find, that the claims against the individual defendants relate back to the claims in the original Complaint. *Acccord Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996) ("Sixth Circuit precedent clearly holds that new parties may not be added after the statute of limitations has run, and that such amendments do not satisfy the 'mistaken identity' requirement of Rule 15(c)(3)(B)."). Thus, the question is whether the plaintiff can point to evidence suggesting that the individual defendants took any potentially retaliatory actions within the year preceding the filing of the Amended Complaint. In that regard, the only alleged actions in which the plaintiff claims Lokey had any involvement took place in 2015, more than a year before the plaintiff filed the Amended Complaint. Similarly, the only allegedly retaliatory action by Anderson in his individual capacity was his decision to transfer the

plaintiff to the Youth Services Division, effective December 1, 2015. Although the plaintiff also seeks to attribute to him the decision to transfer her to the Records Division, the undisputed facts show that Anderson had no involvement in her transfer to the Records Division. Even if he had, that transfer took effect in January 2016, outside the limitations period.

In her Response to the Motion for Summary Judgment, the plaintiff argues that her retaliation claim encompasses actions "occurring from January 5, 2016 (the initial instigation of investigation into Public Interest Letter), through Defendant's investigation, the FBI's investigation, Plaintiff's indictment and prosecution, and ultimate closing of Plaintiff's criminal case on or around February 2019." (Doc. No. 70, at 31.) She claims that the statute of limitations for her First Amendment retaliation claim did not begin to run until the forgery prosecution against her concluded in February 2019.

Even if the plaintiff were correct in stating that a First Amendment retaliation claim based on the investigation, indictment, arrest, and prosecution for forgery was tolled until the charges against her were dropped, she has not pointed to any allegations in the Amended Complaint, or to concrete facts in the record, remotely suggesting that Lokey or Anderson personally had any involvement in the forgery investigation, particularly that undertaken by the FBI, or in the decision to indict, arrest, and prosecute her on charges of forgery. On its face, the Indictment shows that the charges were brought by the Davidson County District Attorney's Office. (*See* Doc. No. 55-6, at 1 (identifying the sole witness before the Grand Jury as Randy Martin, District Attorney's Office); *id.* at 2 (showing the Indictment was signed by the Glenn R. Funk, District Attorney General, Twentieth Judicial District).). The plaintiff points to no actual evidence, direct or circumstantial, showing that Anderson or Lokey was involved in her prosecution.

The court therefore finds that the plaintiff has failed to create a material factual dispute as to whether either individual defendant engaged in any retaliatory act within the limitations period. Lokey and Anderson are entitled to summary judgment in their favor on this claim on this basis as well.

### D.     TPPA Claim

The TPPA provides in pertinent part:

(b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.

. . . .

(d)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn. Code Ann. § 50-1-304(b), (d). The plaintiff bears the "burden of establishing a *prima facie* case of retaliatory discharge" in violation of the TPPA. *Id.* § 50-1-304(f).

A *prima facie* case under the TPPA has four elements: (1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in, or remain silent about, illegal acts; (3) the employer discharged or terminated the employee; and (4) the sole reason for the termination was the employee's refusal to participate in or remain silent about the illegal activity. *Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015) (citing *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011)).

The defendants argue that the plaintiff cannot establish any of these factors aside from the first one: there is no dispute that she was employed by Metro. Otherwise, the defendants contend that the plaintiff cannot show that Metro participated in any illegal acts or that the plaintiff was

threatened for refusing to participate in, or remain silent about, such illegal acts[8]; the plaintiff was not discharged or terminated—instead, she resigned; and she cannot show an exclusive causal relationship between her termination and her refusal to remain silent about illegal events. In response, the plaintiff argues that she has presented sufficient evidence to create a material factual dispute as to each element of her claim.

       *1.     Whether the Plaintiff Refused to Participate in, or Remain Silent About, Illegal Acts*

Regarding the second element, Thaxter asserts: "Plaintiff refused to falsify her investigative findings report concerning Sgt. Spencer, despite being asked to by another officer, and instead Plaintiff resubmitted her original findings." (Doc. No. 70, at 34.) The plaintiff alleges, in other words, that she refused to remain silent about Spencer's allegedly illegal conduct. The only evidence in the record that provides a comprehensive description of the incident to which the plaintiff refers is in the Metro HR Investigative Summary of its interviews with Thaxter in December 2015 and February 2016,[9] which states in relevant part as follows:

> According to Lt. Thaxter, on April 23, 2015, Sergeant Jason Spencer received a citizen's complaint. Lt. Thaxter said she believed this April 2015 complaint was the 4th citizen-generated complaint Sgt. Spencer had received during the eight (8) months he had been under her supervision. She told Fact Finders that on May 29,

---

[8] The defendants cite an outdated, unreported Tennessee case in support of the proposition that the plaintiff must show an explicit instruction to remain silent or an implicit threat that her job depends on her remaining silent. (*See* Doc. No. 56, at 21 ("Thus to satisfy the second factor of the *Merryman* test, there must be both an illegal activity and a threat to remain silent about said activity." (citing *Merryman v. Cent. Parking Sys., Inc.*, No. 01A01-9203-CH-00076, 1992 WL 330404, *18 (Tenn. Ct. App. Nov. 13, 1992)).) The Tennessee Supreme Court has unambiguously held that "the action of retaliatory discharge 'for refusing to remain silent about illegal activities' does not require a showing that the employer expressly or implicitly directed the employee to remain silent about the illegal activity." *Mason v. Seaton*, 942 S.W.2d 470, 470–71 (Tenn. 1997).

[9] In her Response to the Motion for Summary Judgment, the plaintiff cites to her deposition testimony in support of this assertion, but that part of the deposition transcript that has been included in the court's record does not adequately elucidate what the plaintiff is talking about. (*See* Doc. No. 70, at 34 (citing Thaxter Dep. 114–116); *see* Thaxter Dep., Doc. No. 55-1 (skipping from page 104 to page 115 and from 115 to 117).)

2015, after investigating the complaint against Spencer, and after reviewing his report of his interaction with the complaining citizen, that she delivered her findings to Cmdr. Lokey. Lt. Thaxter stated she (Thaxter) presented a finding of "sustained" for two of the three charges made by the citizen: 1) not following proper complaint procedure and 2) not adhering to instruction. According to Lt. Thaxter, both Cmdr. Lokey and the Midtown Hills' Precinct Accountability Lieutenant or "PACL," Lt. Eric Snyder (white male) did not want to proceed with discipline against Sgt. Spencer, with Lt. Snyder telling Thaxter she should go home and "sleep on it" and come back the next day with a softer approach toward Sgt. Spencer.

Lt. Thaxter stated she did in fact "go home and sleep on it," and when she returned to the precinct the next day she told Lt. Snyder that she "could not and would not" change her mind about the appropriate level of discipline to level against Sgt. Spencer. According to Lt. Thaxter, at this point, Cmdr. Lokey told her she did not accept Thaxter's findings, and that Lokey then proceeded to pressure her to change her findings to "downplay" the seriousness of the charges against Sgt. Spencer. Lt. Thaxter stated she believed Cmdr. Lokey was again looking out for Sgt. Spencer (white male) and that she (Lokey) did not want anything to jeopardize Spencer's ongoing effort to be promoted to Lieutenant. (By MNPD rule, Sergeants are not eligible for promotion if they have more than 3 days of suspension from duty during the previous 12 months of the final date on their application.)

Lt. Thaxter told Fact Finders that because she (Thaxter) stood her ground, Cmdr. Lokey elected to forward her (Thaxter's) findings to Captain Chris Gilder at OPA for review. Lt. Thaxter stated that at some point between early July and mid-August, Capt. Gilder advised her as well as Cmdr. Lokey and Lt. Snyder that "Lt. Thaxter did the wrong charges" against Sgt. Spencer, and more serious charges, with more serious penalties, should instead be pursued. Lt. Thaxter stated she had also sent a copy of her findings against Sgt. Spencer to Kathy Morante head of OPA. Lt. Thaxter stated that on either August 28 or 29, 2015, Cmdr. Lokey, again tried to get her (Thaxter) to change her mind by asking Thaxter "Ok, what's the best possible solution here?" Lt. Thaxter said she attempted to offer a compromise which would have resulted in fewer days of suspension for Spencer (but would have still hampered his promotional chances). She said Cmdr. Lokey overrode both Thaxter's findings as well as OPA's recommendations, and found Spencer guilty of but one charge, and dismissed the other two. According to Lt. Thaxter, the resulting penalty against Sgt. Spencer protected him for promotional purposes. Fact Finders learned that Sgt. Spencer appealed his resulting discipline; however the final result of his appeal was unknown at the time this report was completed.

(Doc. No. 55-3, at 6–7.)

In response to the defendant's argument that the facts as alleged by the plaintiff do not establish that Metro engaged in illegal acts, the plaintiff contends that the TPPA's "protection

extends to employees who have reasonable cause to believe a law, regulation, or rule has been violated or will be violated, and in good faith report it." (Doc. No. 70, at 34 (quoting *Mason*, 942 S.W.2d at 472).) The plaintiff's report, as described above, indicates that she reasonably believed, based on a citizen's complaint, that Spencer had violated some rules or regulations and that she refused to remain silent about the violations and reported them to Lokey, her supervisor, who refused to sustain Thaxter's findings or recommended discipline. Although it appears that Thaxter reasonably believed that Spencer had violated some rules or regulations, Tennessee caselaw also establishes that the alleged "illegal activity" "must implicate important public policy concerns." *Williams v. Greater Chattanooga Pub. Television Corp.*, 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011); *see also Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 538 (Tenn. 2002) ("Our inquiry, however, is not limited to whether a particular law or regulation has been violated; rather, our inquiry focuses on whether some important public policy interest embodied in the law has been furthered by the whistleblowing activity." (internal quotation marks and citation omitted)). The record does not actually indicate exactly what Spencer did or identify the rules or regulations the plaintiff contends that he violated, but, according to Metro HR's Investigative Summary, above, the plaintiff had charged him with "not following proper complaint procedure" and "not adhering to instructions." (Doc. No. 55-3, at 6.) While it is undoubtedly important that police officers follow proper complaint procedures and adhere to instructions, neither of these charges appears to implicate important public policy, nor, likewise, would Lokey's downgrading of the offenses implicate important public policy. In any event, the plaintiff has made no attempt to identify the important public policy she believed to be at issue. On this basis, the court finds that the plaintiff fails to adequately allege facts to support this element of her claim.

## 2. *The Exclusive Causal Relationship*

Even if she had established the second element, Thaxter stumbles at the fourth element of her TPPA *prima facie* case. There is no dispute that the plaintiff took FMLA leave beginning in early January 2016 and formally resigned her employment in May 2016, although her resignation did not become effective until September 2016. Thus, to establish her claim, the plaintiff must present evidence to create a material factual dispute as to whether she was constructively discharged, rather than terminated, and as to whether her refusal to remain silent about Spencer's allegedly illegal activity was the *sole* reason for her constructive discharge. *See Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015) ("[T]he TPPA requires the plaintiff to prove that retaliation for the protected conduct was the *sole* reason [for the termination of his employment]." (citations omitted)). This is a high bar. *See id.* at 110–11 ("The General Assembly's choice of the term 'solely' means that an employee can prevail with a Tenn. Code Ann. § 50-1-304 claim only if he or she can prove that his or her refusal to participate in or to remain silent about illegal activities was the only reason for the termination." (citation omitted)).

Her attempt to draw the connection between her protected activity and her constructive discharge results in a very crooked line:

> It is Plaintiff's contention that upon notifying Sgt. Spencer and Lt. Snyder that she would not falsify her report and investigation into the complaint against Sgt. Spencer, Sgt. Spencer then secretively recorded a roll call meeting led by Plaintiff, and then filed a complaint against Plaintiff stemming from the roll call speech. This roll call video was then leaked to a local news media outlet by Sgt. Hale. Additionally, the media was incorrectly informed that Plaintiff was having sexual relations with the chief. Upon discovering the disclosure by Sgt. Hale, Plaintiff requested that Ms. Monrante [sic] open an[] investigation into Sgt. Hale's leak to the media. Sgt. Hale was not disciplined for release of the video and false information to the news media.

(Doc. No. 70, at 36 (internal citations to the record omitted).) The plaintiff asserts both that these actions created a working environment that was "so intolerable that a reasonable person would

resign her employment" (Doc. No. 70, at 36 (quoting *Bazemore v. Performance Food Group, Inc.*, 478 S.W.3d 628, 636 (Tenn. Ct. App. 2015)), thus giving rise to a genuine issue of material fact as to whether she suffered a constructive discharge, and that the "temporal proximity and volume of the adverse actions in relation to when Plaintiff refused to engage in falsification of reports, and the individuals engaging in the adverse actions . . . indicate that Plaintiff's refusal to engage in the conduct was the cause of the actions taken against her" (*id.* at 37).

The problem with her argument is that the events allegedly giving rise to the intolerable conditions have no apparent connection, other than the plaintiff's *ipse dixit*, to the plaintiff's refusal to "remain silent" about Spencer's illegal activity. Specifically, there is no apparent connection between her refusal to remain silent about Spencer's illegal actions and Hale's alleged leaking to the media a copy of the video of the August 2015 roll-call meeting, Hale's allegedly suggesting to the media an improper relationship between the plaintiff and Chief Anderson, and the MNPD's failure or refusal to investigate Hale for the leak of the video. Even assuming that the temporal proximity between the plaintiff's protected activity and the retaliatory acts she complains of might give rise to an inference of *some* causal connection, which, in itself is a stretch,[10] the plaintiff's own descriptions of her decision to leave the MNPD conclusively refute the existence of an *exclusive* causal connection between the plaintiff's whistle-blowing and her departure. In her deposition, she made it clear that a culmination of many events, in particular her reassignment to the Records Division, pushed her to resign:

Q. Okay. Then when did you go to records? Did you actually report to records?

---

[10] The Tennessee Supreme Court has stated, with reference to a TPPA claim, that "proximity in time between the protected act and the discharge is not sufficient to establish a causal relationship," *Mason*, 942 S.W.2d at 473, but that close proximity in time coupled with evidence from the employee that she had always performed satisfactorily could establish an inference of causation. *Id.* at 473–74.

> A. I did not. That – I think they told me to go to DV, I did my interview. They took me downtown. I saw Deputy Chief Henry. They presented the letter and they said report [to Records] – whatever the report date was, I had had enough. My mental – I had had enough. And I was just going to resign then.

(Thaxter Dep. 179, Doc. No. 55-1, at 60.) The record establishes that Thaxter's assignment to Records arose from the OPA's investigation into alleged misstatements in her complaint against Lokey. In her resignation letter to Anderson, the plaintiff outlined even more clearly the number of factors that led to her decision to resign, including "the continuous mental and emotional trauma stemm[ing] from sexual harassment, discrimination, and retaliation within the department, as well as being subject[ed] to a hostile working environment for approximately one year from senior members of the [MNPD]." (Doc. No. 55-7, at 1.) Further, she noted that, after her transfer to Youth Services, she was perceived as receiving preferential treatment, which caused additional problems for her, "elevat[ing]" the "hostile work environment" she had been experiencing. (*Id.*) And finally, the fact that the plaintiff was being investigated for forgery clearly played a role in her decision to resign.

In other words, the plaintiff's own evidence shows that the basis for her decision to resign, which she characterizes as a constructive discharge, was multi-factorial. Thus, even assuming that the plaintiff experienced what she perceived as a hostile work environment and conditions sufficiently intolerable that a reasonable person in her position would have resigned, the plaintiff has not shown that her engaging in protected activity, together with the allegedly retaliatory actions connected to that activity, was the *sole* cause of her resignation/constructive discharge. *See White v. Fort Sanders-Park W. Med. Ctr.*, No. E2006-00330-COA-R3CV, 2007 WL 241024, at *4 (Tenn. Ct. App. Jan. 29, 2007) (noting that a plaintiff asserting constructive discharge in the context of a TPPA claim must demonstrate "genuine issues of fact with regard to whether she was constructively discharged, and whether an exclusive causal relationship exists between her

discharge and her alleged whistleblowing activity" (citing Tenn. Code Ann. § 50-1-304)). Viewing all the proof in the light most favorable to Thaxter, no reasonable juror could conclude that the sole reason for the termination of her employment was her refusal to remain silent about the alleged illegal activity.

Because the plaintiff cannot establish the requisite elements of her *prima facie* case, Metro is entitled to summary judgment on this claim.

## V. CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment will be granted in part and denied in part. The motion will be denied with respect to the plaintiff's Title VII claim for sexual harassment, but granted with respect to all other claims. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge